UNITED STATES of America, Plaintiff,

v.

**METROPOLITAN DISTRICT COMMISSION, et al.,
Defendants.**

**CONSERVATION LAW FOUNDATION OF NEW ENGLAND, Plaintiff,**

v.

**METROPOLITAN DISTRICT COMMISSION, et al.,
Defendants.**

**Civ. A. Nos. 85–0489–MA, 83–1614–MA.**

United States District Court,
D. Massachusetts.

Feb. 25, 1991.

Andrew S. Hogeland, Asst. U.S. Atty., Karen F. Green, Sp. Asst. U.S. Atty., Hale & Dorr, J.W. McCormack, Boston, Mass., Ralph J. McGovern, Environmental Enforcement Section and Natural Resources Div. U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Anne Crocker Phillips, Ropes & Gray, Boston, Mass., for Compliance Monitor.

Catherine L. Farrell, Gen. Counsel, M.W.R.A., Boston, Mass., for MWRA.

Murphy, Demarco & O'Neil, Boston, Mass., for City of Quincy.

E. Michael Sloman, Asst. Atty. Gen., Boston, Mass., for State defendants.

Laura Steinberg, Sullivan & Worcester, Boston, Mass., for Boston Water & Sewer Authority.

John Stevens, Foley, Hoag & Eliot, Boston, Mass., for Mass. Water Resources Authority.

Bradford S. Gentry, Samuel Hoar, Jeffrey C. Bates, Goodwin, Proctor & Hoar, Boston, Mass., for Conservation Law Foundation of New England.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before me on plaintiff the United States's motion to compel the defendant Commonwealth of Massachusetts to transfer ownership of a parcel of state-owned land located in Walpole, Massachusetts, to the Massachusetts Water Resources Authority ("MWRA") for use as a residuals landfill site as part of this court's remedial orders relating to the Boston Harbor clean-up project. In the alternative, the United States seeks an order banning new sewer hook-ups in the MWRA service area (with exceptions for residential and public health uses) until the MWRA is in compliance with the scheduling order previously issued by this court in this matter. A hearing regarding this motion was held on January 10, 1991. Counsel appeared for plaintiffs the United States and the Conservation Law Foundation, for defendants MWRA and the Commonwealth, and, as *amicus*, for the Towns of Walpole and

Norfolk. For the reasons discussed below, I hereby allow the motion and enter an order banning new sewer hook-ups in the MWRA service area.

## I. HISTORY

### A. *Summary of the Case*

A brief summary of this case to date is helpful in understanding the context in which this motion was filed. In June, 1983, the Conservation Law Foundation ("CLF") filed suit in this court against the Metropolitan District Commission ("MDC") and the United States Environmental Protection Agency ("EPA"). CLF's suit sought remedies for violations of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1377 (the "Act"), resulting from massive, ongoing discharges of sewage into Boston Harbor by the state agency responsible for wastewater treatment in the greater Boston area. In January, 1985, the United States filed a similar suit, and the cases were consolidated. In September, 1985, this court found the MDC and the MWRA, its successor agency, to be in violation of the Act, of the permits issued to the MDC and the MWRA under the Act, and of a 1980 administrative compliance order issued by the EPA. *United States v. Metropolitan Dist. Comm'n*, 23 Env't Rep.Cas. (BNA) 1350, 16 Envtl.L.Rep. (Envtl.L.Inst.) 20621, 1985 WL 9071 (D.Mass. Sept. 5, 1985).

Following the entry of the order determining liability for violations of the Act, this court held a further hearing at which the parties presented expert and technical testimony regarding a remedial schedule. After hearing, an elaborate construction schedule and reporting process were imposed as part of the remedial order. The remedial order calls for the construction of a new $6 billion sewage treatment system for the metropolitan Boston area and requires the MWRA to file monthly compliance reports. Sixty-one compliance reports have been filed, and this court has entered corresponding compliance orders based on those reports since November, 1985. The monthly compliance orders are supplemented from time to time with specific orders

designed to elaborate on particular scheduling requirements.

The overall construction project may be summarized as follows. Sewage from the MWRA's member communities will continue to be processed at Deer Island in Winthrop, where a new primary and secondary sewage treatment plant will be built. Treated liquid effluent will be pumped from Deer Island out approximately nine miles by underwater tunnel to a point in Massachusetts Bay. The solid portion of the sewage will be separated into two primary components: (1) grit and screenings and (2) sludge. The sludge will be piped by underwater tunnel from Deer Island to the Fore River Staging Facility in Quincy, where the MWRA is constructing a residuals management facility. At this facility, the sludge will be converted into pelletized form. The MWRA's residuals management plan calls for market distribution of the pellets as commercial fertilizer. The grit and screenings will be transferred to a landfill. In the event the MWRA is unable to market or otherwise legally dispose of the pelletized sludge, it will be deposited in the landfill as well. The selection of a site for the landfill is a crucial aspect of the overall completion of the plan.

The process of selecting a landfill site began in 1986. Nearly 300 potential sites within the MWRA service area were evaluated for use as a residuals management facility. The list was eventually narrowed to twelve candidate sites, located in Boston, Lynn, Quincy/Braintree, Stoughton, Walpole, Wilmington, Ashland, Bedford, and Malden/Revere. In January, 1989, the MWRA's Board of Directors determined that a site adjacent to the Massachusetts Correctional Institute at Cedar Junction in Walpole, near the Town of Norfolk (the "Walpole site"), was the preferred site; Rowe Quarry on the Malden–Revere line was chosen as an alternative site. The Walpole site is currently owned by the Massachusetts Department of Corrections and has been considered as a site for prison expansion. Under Massachusetts law, an act of the legislature is required to transfer the site to the MWRA for use as a landfill.

*See* Memorandum of the United States in Support of the Motions Regarding Acquisition of the Walpole Site at 10 n. 4. Similarly, the Rowe Quarry site is privately owned and legislation would be required to enable the MWRA to acquire the site by eminent domain.

The MWRA's proposed residuals management program was required to undergo environmental review at both the state and federal levels. On November 20, 1989, the Massachusetts Secretary of the Executive Office of Environmental Affairs issued a certificate accepting the MWRA's final Environmental Impact Report on the long-term residuals management plan, which included designation of the Walpole site as the preferred residuals landfill. In January, 1990, the Towns of Norfolk and Walpole filed actions in state court challenging the state environmental review process that resulted in the selection of the Walpole site. These cases have been joined and are pending in Suffolk County Superior Court. On March 30, 1990, the EPA issued its record of decision accepting the MWRA's final Environmental Impact Statement, including selection of the Walpole site. Soon thereafter, the Towns filed suits in this court challenging the EPA's review of the siting decision.

In May, 1989, this court issued a long-term scheduling order, which included a requirement that the parties develop a schedule for construction of the long-term residuals management facilities. On October 31, 1990, this court issued a long-term residuals management scheduling order. That order requires completion of the design of the landfill by November, 1991, commencement of construction no later than September, 1992, and operation of the landfill by March, 1994.

Extensive delays have plagued the MWRA's longstanding effort to obtain legislative approval for transfer of the Walpole site. Those efforts culminated recently in a vote by the Massachusetts House of Representatives defeating a bill that would have authorized the transfer. Prompted by this and similar delays, the United States filed the present motion. This court denied a motion filed by the Towns of Walpole and Norfolk to intervene in the resolution of the present motion; however, I did allow the Towns to participate on an *amicus* basis. Memorandum and Order, *United States v. Metropolitan Dist. Comm'n*, 754 F.Supp. 935 (D.Mass.1991).

## B. *Delays in Obtaining the Landfill Site*

Because the construction of the residuals landfill is a crucial element of the entire clean-up plan, I have closely monitored the progress of this aspect of the schedule for the last two years. In this court's Schedule Two Compliance Order No. 37 (Jan. 25, 1989), I noted that the MWRA had approved the Walpole site as the preferred site for the landfill. At that time I stated,

> We are all aware that these are hard choices which will certainly face local opposition. But as with all hard choices, they will be examined in relation to applicable planning criteria and concerns relating to coordination with other major projects that will occur in the harbor area, to ensure all that environmental and due process considerations are addressed. The MWRA is reminded, however, that regardless of whether the selected method of disposal involves incineration, pelletizing, or other methods of disposal, the one site that will *not* be available for residuals disposal is Boston Harbor.

*Id.* at 4.

In Schedule Two Compliance Order No. 41 (May 23, 1989), I granted the EPA's request to require the MWRA to report on the status of the legislation needed to transfer title to the Walpole site to the MWRA. At that time I noted, "In view of the importance of this matter to the sufficiency of the overall plan, the suggestion is adopted, and the MWRA is hereby ordered to file such a report...." *Id.* at 10.

In the next compliance order, I noted that the Governor had decided to postpone filing the necessary legislation. At that time I asked the MWRA to "estimate the delay in other scheduled activities, if any, that failure to obtain access to the site would cause" in order for me to decide

"whether further action on my part is required." Schedule Two Compliance Order No. 42, at 3 (June 23, 1989). Schedule Three Compliance Order No. 43 (July 31, 1989) referred to certain other acts of the legislature that threatened to interfere with this court's schedule. I stated, "As I have said on many occasions, it is not my intent to interfere with the state legislative process. On the other hand, I must review any steps taken by the state legislature or any other entity that would interfere with a remedial order of this Court." *Id.* at 2. I also ordered the Commonwealth, in addition to the MWRA, to report on the progress of the legislation to transfer the Walpole site "to make sure that there is no slippage in implementation of the long-term residuals management program." *Id.* at 3.

When the Governor thereafter decided to delay filing the necessary legislation until completion of the state environmental review process, and the EPA acquiesced in that decision, I agreed that my intervention was unnecessary. Again I warned, "In the event of any slippage in the schedule for completion of the state environmental review process, however, I will reconsider whether further action is appropriate concerning this issue." Schedule Three Compliance Order No. 44, at 3 (Aug. 24, 1989).

In May, 1990, the United States, concerned that problems besetting the use of the Walpole site would bog down the overall project, requested an order to require the MWRA to commence planning of an alternative landfill site. *See* Schedule Three Compliance Order No. 53, at 7–8 (May 30, 1990). Wishing to avoid the expense of duplicative efforts, and unwilling to act on an incomplete record, I deferred decision on the motion. At that time I reiterated,

> I will not interfere in the local and state processes so long as there is no real and imminent threat to the schedule that has been imposed to remedy decades of violation of federal law.... The legislature and executive have always before acted on a timely and responsive basis when faced with critical decisions relating to

the Harbor clean up. I have no reason to believe they will not do so at this time. *Id.* at 9.

After receiving assurances from the Commonwealth that "the Administration is committed to seeing the legislation authorizing transfer of the Walpole site to the MWRA approved," Schedule Three Compliance Order No. 54, at 7 (July 2, 1990), and upon learning that the House had voted to defer action on the legislation until December 5, 1990, I stated,

> I believe the best course is to withhold current action until December 5, 1990.... As I have repeatedly stated throughout this litigation, this Court should not become involved in the substantive decision-making process required to site, design, and build the facilities necessary to achieve full and timely compliance.... My role is to see that decades of violations of federal law were identified, and, once identified, terminated as quickly as reasonably possible....
>
> At the same time, I am mindful of the huge risk that attends my decision to forego action until December 5, 1990. At stake is the credibility of the Court's schedule and the public's faith in the integrity of the entire project.... In the event that necessary legislation has not been approved by that date and that slippage in the schedule results from the paralysis surrounding the siting issue, I will entertain and intend to grant a motion for sanctions designed to ensure immediate resolution of this matter.

*Id.* at 8–9.

In Schedule Three Compliance Order No. 59, at 7 (Nov. 26, 1990), I stated, "In the event the authorization for the transfer is not approved by December 5, 1990, a hearing will be held on these matters at the earliest opportunity." Finally, the Massachusetts House of Representatives voted down the legislation to transfer the Walpole site to MWRA. I commented: "The United States suggested some months ago that awaiting legislative resolution of this issue would prove unavailing.... Unfortunately, the United States has been proven correct.... My confidence was mis-

placed. As the Conservation Law Foundation has put it succinctly, the legislature has defaulted to the Court." Schedule Three Compliance Order No. 60, at 2 (Dec. 26, 1990).

The reason for the foregoing review of my prior compliance orders is to emphasize that I have long viewed the siting of the landfill as integral to this court's schedule to bring the MWRA into compliance with federal law. Moreover, I have consistently stated my reluctance to take a substantive decision-making role in the process, and I have been sensitive to the conflict between state and federal authority that court action would implicate. However, I have also made it clear that I would consider taking action at such time that this court's scheduling order is jeopardized. That time has come.

## II. OBJECTIONS TO COURT ACTION

### A. *Site–Specific Objections*

The lengthy briefs filed with regard to this motion and the arguments made at the hearing focused primarily on the authority of this court to order the legislature to pass specific legislation to transfer the Walpole site to the MWRA. Because I have decided not to issue such an order at this time, I leave those arguments for another day, with the express hope that responsible actions on the part of the legislature will relieve me of the necessity of entering such an order in the future. I do, however, wish to comment on some specific objections that were raised in consideration of this motion. Namely, the Towns argued against the transfer of the Walpole site because of the threat of environmental harm, the availability of commercial channels to dispose of the residuals, and the need for prison expansion.

The Towns argued forcefully that the environmental impact of depositing sludge pellets at the Walpole site will be detrimental to the water supply and will otherwise harm the ecology of the area. Specifically, the Towns claim that the landfill site threatens groundwater sources, the nearby Neponset sole-source aquifer, wetlands, and woodlands. With regard to the aquifer, the Towns have recently petitioned the EPA to redraw the aquifer boundary to include the landfill footprint. Tests necessary for the EPA to rule on this petition cannot be performed until after the spring thaw.[1]

■ This court is sensitive to the environmental effects of the clean-up project. In addressing the Towns' concerns, I first wish to stress that the planned landfill will be used primarily for the deposit of grit and screenings, rather than sludge. The landfill is only to be used as a back-up site for sludge pellets, should efforts to market them commercially fail. In this connection it should be recalled that the MWRA is pursuing independent sludge application research and has already contracted to provide at least 32,000 tons of fertilizer to be land-applied out-of-state for agricultural purposes. *See* MWRA Monthly Compliance Report for Oct. 1990 and Progress Report as of Nov. 15, 1990, at 9–10. While no guarantee, this effort indicates a continuing commitment to avoid using the landfill for sludge. Moreover, there is always the possibility of developing a different, but equally effective and timely long-term solution to the residuals management problem. Nonetheless, to answer the Towns' objection more directly, I must assume for the purposes of the present motion that the state and federal environmental review processes adequately took the area's environmental characteristics into account. (Whether that is so will be fully considered in the related NEPA and MEPA cases in this and the state court.) The fact that certain petitions are still pending, however, should not prevent the MWRA from going forward with site acquisition or from beginning the *design* phase of the residuals management schedule.

The Towns have also challenged the environmental review process itself, both in

---

**1.** In addition, the Towns argued that the United States Army Corps of Engineers permit, also necessary for the site to be used, had not yet been obtained. The Corps, however, has recently approved the clean-up project, including the proposed Walpole site.

response to this motion and in separate state and federal suits. The Towns cite language in First Circuit cases to the effect that once agency decisions are made, they are hard to reverse. *See, e.g., Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir.1989); *Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir.1983). In those cases, however, the plaintiffs sought to prevent the agencies from going forward with their plans *before* environmental review was complete. The irreparable harm threatened in those cases (for they were decided under the preliminary injunction standard), colorfully described as a "bureaucratic steam roller," *Marsh*, 872 F.2d at 504, was the harm of the agencies being committed to specific plans "without the information that NEPA seeks to put before the decisionmaker." *Id.* at 497. Here, by contrast, both the state and federal environmental review processes have long been completed; the MWRA's decision was fully informed by its NEPA and MEPA studies. As the First Circuit stated in *Watt*, "NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed . . . to make government officials notice environmental considerations and take them into account." 716 F.2d at 952. The Towns may challenge the environmental review process, but the legal questions involved in challenges to completed environmental impact studies are far different from the questions that were at issue in *Marsh* and *Watt*. To the extent that the Towns argue that the pending cases provide a reason to delay court action with regard to acquisition of the landfill site, I refer the parties to this court's recent opinion denying the Towns' motion to intervene. Memorandum and Order, *United States v. Metropolitan Dist. Comm'n*, 754 F.Supp. 935 (D.Mass.1991).

■ The Towns also argue that the MWRA's selection of the Walpole site was flawed because it did not consider commercial options for disposal of grit, screenings, and sludge. The private option, however, was considered and specifically rejected by the Commonwealth's own Department of Environmental Protection as a replacement for a state-owned landfill as a long-term solution. *See* Letter from Steven G. Lipman, Boston Harbor Coordinator, Massachusetts Executive Office of Environmental Affairs, to Eric Buehrens, Program Manager, MWRA (May 4, 1990). The main reason for rejecting this option, with which I concur, is that it deprives the MWRA of control of one of the critical elements in the clean-up process. Nothing in my action today precludes the Commonwealth from seeking alternative technological solutions to the residuals problem—but the time to implement such alternatives is growing short.

■ Finally, the Towns have interposed the need to build more prisons. Specifically, the Towns now firmly support the use of the Walpole site for construction of a proposed 500–bed maximum security prison, support which seems to coincide with the selection of the Walpole site as the preferred site for the landfill. I have said many times, however, that it is not this court's intention to intervene in the Commonwealth's decisions regarding the use of its land, unless absolutely necessary to ensure compliance with federal law. My position remains the same. If, when, and where a new prison is built is the Commonwealth's responsibility. It is also the Commonwealth's responsibility to participate in the process of providing an acceptable site for a landfill so that the harbor clean-up schedule is maintained.

### B. *Objections to the Timing of Court Action*

■ In addition to arguing specifically against the transfer, the Commonwealth argued that *any* action by the court at this time would be "premature." At the hearing, counsel for the Commonwealth pointed out that construction of the landfill is not scheduled to begin until September, 1992. Counsel for the MWRA stated that, if he had to give an absolute deadline for acquisition of the Walpole site, it would be that September, 1992, date. Thus, the Commonwealth argues, I can delay taking action until then. In fact, the Commonwealth ar-

gued at the hearing that my deciding to do nothing would be an incentive for the parties to come to some agreement regarding this or another site.

I have two answers to this objection. First, the statement that the schedule is not yet in severe jeopardy is true only if one assumes that the landfill will ultimately be located at the Walpole site. If I must eventually order the Commonwealth to effect the transfer, I can delay doing so for some time, although I do not believe that court action can wait as long as September, 1992. But if the Walpole site, for which much of the requisite studying, planning, and testing has already been completed, is *not* to be the ultimate site for the landfill, then another site must be selected *immediately* if there is to be any chance of beginning construction as planned. In fact, given the need to complete state and federal environmental impact reports for any new site, it may already be too late. It is therefore my conclusion that there is now a real and imminent threat to the schedule.

As to the argument that my inaction will provide an incentive, I could not disagree more. I have already delayed action as long as possible. My restraint has not produced any results, except a vote of the House of Representatives that seems to indicate that the landfill siting is not the legislature's problem. Not only has its action foreclosed the Walpole site, it has also proposed legislation intended to foreclose other sites, including the next preferred alternative. Since the last bill was defeated, no new bill is pending, there is no legislative action or discussion that I know of, and no indication that any action is contemplated. With my action today, I hope to remind the Commonwealth that it was responsible for polluting the harbor and it will be held accountable for completing the clean-up.

## III. PROPRIETY OF A MORATORIUM

■ The Federal Water Pollution Control Act contemplates a court order of a moratorium of sewer connections as a remedy against any state that fails to comply with discharge permit provisions:

In the event any condition of a permit for discharges from a treatment works ... is violated, ... the Administrator ... may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

33 U.S.C. § 1342(h).

In 1985, this court found the Commonwealth and the MWRA to be in violation of several provisions of their National Pollution Discharge Elimination System ("NPDES") permit then in effect. Specifically, I found violations of the monthly average effluent limits established in the permit for each month from September, 1980, to May, 1985. For a more detailed description of the violations, and for more precise definitions of the technical terms discussed below, I refer the reader to this court's opinion finding liability. *United States v. Metropolitan Dist. Comm'n,* 23 Env't Rep.Cas. (BNA) 1350, 16 Envtl.L. Rep. (Envtl.L.Inst.) 20621 (D.Mass. Sept. 5, 1985).

Permit violations continue to this day. The NPDES permit now in effect, dated December 9, 1986, sets monthly average effluent limits for certain pollutants as follows: biochemical oxygen demand ("BOD"), 30 mg/1; total suspended solids ("TSS"), 30 mg/1. Most pertinent, the permit prohibits the discharge of sludge. In August, 1990, the violations at Deer Island included the following monthly averages: BOD, 100 mg/1; TSS, 74 mg/1. At Nut Island in the same month, violations included the following: BOD, 84 mg/1; TSS, 54 mg/1. Moreover, at Deer Island, 277,000 gallons of sludge were discharged *daily;* at Nut Island, the discharge was 286,000 gallons *daily. See* Affidavit of Richard P. Kotelly, ¶ 16, Ex. N. These sophisticated measurements tend to obscure the stark reality of the situation: the raw sewage generated by the residents of metropolitan Boston is spewed forth each day, minimally treated, into Boston Harbor, in ongoing violation of federal law. So long as the MWRA has been in substantial compliance

with this court's scheduling orders, the EPA has refrained from proceeding under the injunction provision of the Act. Now, however, the MWRA's inability to proceed in the residuals management operations poses a severe threat to the schedule, and the EPA has sought the remedy of a moratorium. Such a remedy is appropriate. So long as the MWRA is not going forward with a plan to alleviate the pollution of Boston Harbor, it should not be allowed to *increase* pollution.

I believe that there are several other reasons why issuing a moratorium of new sewer hook-ups, with certain exceptions, is the proper course of action. Such an order is in accordance the court's longstanding policy of not interfering in substantive decision-making regarding this project. A moratorium merely gives the parties an added incentive to get the project back on schedule. Moreover, such an order is explicitly authorized by an act of Congress and avoids the federalism implications of a court-ordered transfer.

While the arguments of the parties at the recent hearing were directed primarily to the merits of ordering a direct transfer of the site, considerable written material has been submitted, and suggestions were made orally, concerning the propriety of a moratorium in view of the difficult economic climate in the Commonwealth and the possibility that the moratorium may cause further, significant economic disruption. This economic impact is of critical importance to the court, and I have attempted, without success, to fashion a less severe sanction. Although certain of the parties suggest that civil fines alone would be an adequate remedy, I do not agree. In the first place, fines are unlikely to result in any immediate movement by the legislature. Second, fines would eventually have to be paid by the MWRA's ratepayers, who are not directly responsible for the current impasse and who are already facing rapidly escalating sewer charges.

Further, the legislature always has the opportunity to end the moratorium by approving the transfer of the Walpole site or any other site that could be adapted for the purpose reasonably within the schedule. If the legislature responds responsibly, there should be minimal, if any, effect on the local economy. I acknowledge that a prolonged moratorium could have adverse economic effects, but I find that there is no appropriate, alternative sanction equally likely to resolve the current problem and that the length of the moratorium is entirely within the control of the legislature.

The vote of the House of Representatives, I believe, was informed by a misapprehension of, and perhaps a willful blindness to, the realities of the situation. To borrow a term from the economists, the Boston Harbor clean up is a zero-sum game. If, as federal law requires, "the one site that will *not* be available for residuals disposal is Boston Harbor," another site must be made available. Perhaps the residents of Walpole and Norfolk should not have to bear the brunt of this reality, but someone must. The residents of Winthrop and Quincy have already been called upon, and the participation of other communities will be needed before the project is completed. This order of a moratorium on new sewer connections simply places the burden of the legislature's inaction on the MWRA service area as a whole.

Because I believe that immediate action is called for in order to maintain the clean-up schedule and the integrity of this court's prior orders, and because I find the remedy of a sewer moratorium to be most clearly within this court's power and commensurate with the present danger to the schedule, I allow the motion of the United States. The order will be separately endorsed.

SO ORDERED.

### ORDER

Upon consideration of the motion of the United States regarding acquisition of the Walpole landfill site, and of the exhibits and memoranda submitted in connection therewith, it is hereby ORDERED:

1. Except with regard to (i) facilities shown to be necessary for the public health or safety; (ii) sources that will discharge less than 2,000 gallons of wastewater per

day; and (iii) facilities shown to be needed for the purposes of carrying out this court's orders in this litigation;

A. The Massachusetts Water Resources Authority ("MWRA") shall not accept wastewater from sources that, as of February 25, 1991, were not discharging to the MWRA's sewer system, including hydraulically connected municipal systems (the "Sewage System");

B. The MWRA shall not (i) issue permits for, or otherwise approve, new connections to the Sewage System; (ii) authorize sources currently discharging less than 2,000 gallons per day to the Sewage System to discharge 2,000 gallons or more per day to the Sewage System; or (iii) authorize any source discharging 2,000 gallons or more per day to the Sewage System to increase the amount of waste it discharges to the Sewage System daily;

C. The MWRA shall by March 4, 1991, modify the municipal permits it has issued so that those permits prohibit the cities and towns hydraulically connected to its sewer system from (i) allowing discharges to the Sewage System from sources not utilizing the Sewage System as of February 25, 1991; (ii) allowing sources discharging less than 2,000 gallons per day to the Sewage System to discharge 2,000 gallons or more per day to the Sewage System; or (iii) authorizing any source discharging 2,000 gallons or more per day to the Sewage System to increase the amount of waste it discharges to the Sewage System daily; and

D. Daniel Greenbaum, as he is Commissioner of the Department of Environmental Protection ("DEP"), and Brian Donahoe, as he is Director of the Division of Water Pollution Control, and their agents and employees shall not (i) issue sewer connection permits enabling sources not utilizing the Sewage System as of February 25, 1991, to discharge to the Sewage System; (ii) authorize sources currently discharging less than 2,000 gallons per day to the Sewage System to discharge 2,000 gallons or more per day to the Sewage System; or (iii) authorize any source discharging 2,000

gallons or more per day to the Sewage System to increase the amount of waste it discharges to the Sewage System daily.

2. The MWRA shall not accept discharges from any city or town or any part of any city or town not discharging to the Sewage System as of February 25, 1991.

3. The United States Environmental Protection Agency ("EPA") shall determine, in consultation with the MWRA and the DEP, whether a source is necessary for the public health or safety or needed for the purposes of carrying out this court's orders in this litigation. Disagreements among the EPA, the MWRA, and the DEP may be submitted to the court for resolution.

4. This order shall remain in effect until such time as the MWRA is able to acquire a site suitable for placement of a landfill in compliance with this court's remedial orders relating to this litigation, or until the MWRA achieves full compliance with the terms of its National Pollutant Discharge Elimination System permit, whichever occurs first.