TOWNS OF NORFOLK AND
WALPOLE, Plaintiffs,

v.

The UNITED STATES ARMY CORPS OF ENGINEERS; Lt. Colonel James K. Hughes, in his capacity as the District Engineer; and the Massachusetts Water Resources Authority, Defendants.

Civ. A. No. 91–10771–MA.

United States District Court,
D. Massachusetts.

Aug. 26, 1991.

---

Stephen Daniel Anderson, Anderson & Kreiger, Boston, Mass., Christopher H. Little, Tillinghast, Collins & Grahams, Providence, R.I., Leonard Kopelman and John W. Giorgio, Kopelman & Paige, P.C., Boston, Mass., for plaintiffs.

George Bunsen Henderson, U.S. Attorney's Office, and Steven H. Goldberg, Massachusetts Water Resources Authority, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

In this action, the Towns of Walpole and Norfolk, Massachusetts ("the Towns"), challenge the decision of the United States Army Corps of Engineers to issue permit no. 199000033. The permit in question approves various aspects within the Corps' jurisdiction of a multi-billion dollar sewage treatment project intended to eliminate the pollution of Boston Harbor with untreated sewage from the greater metropolitan Boston area in violation of federal law. The Harbor clean-up is coordinated by the United States Environmental Protection Agency (EPA) and the Massachusetts Water Resources Authority (MWRA) under a remedial order issued by this court after a finding of liability. *United States v. Metropolitan Dist. Comm'n*, 23 Env't Rep.Cas. (BNA) 1350, 16 Envtl.L.Rep. (Envtl.L.Inst.) 20621, 1985 WL 9071 (D.Mass. Sept. 5, 1985). One aspect of the project requiring Army Corps approval is the planned siting of a residuals landfill at a site adjacent to the Massachusetts Correctional Institute at Cedar Junction in Walpole, near the Town of Norfolk (the "Walpole site"). Having challenged the EPA's preparation of the Environmental Impact Statement (EIS) for this aspect of the project under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, *see Town of Norfolk v. EPA*, 761 F.Supp. 867 (D.Mass.1991), the Towns now challenge the Army Corps' compliance with the applicable permitting regulations promulgated under § 404(b)(1) of Clean Water Act, 33 U.S.C. § 1344(b)(1); they also challenge the Corps' compliance with NEPA. This matter is before the court on defendants' motion for summary judgment. Because the ground is well-travelled and the arguments clearly and cogently stated, I do not believe oral argument is necessary. It is also my objective to expedite the appeal process and to permit coordination with the appeal of the earlier NEPA cases.

### I

I need not summarize the background facts of this case, as this ground has been covered in numerous rulings in connection with the Boston Harbor clean-up. Readers unfamiliar with the history of this case may refer to *Town of Norfolk*, 761 F.Supp. at 872–73, and *United States v. Metropolitan Dist. Comm'n*, 757 F.Supp. 121, 123–26 (D.Mass.) (order banning new sewer hook-ups), *aff'd*, 930 F.2d 132 (1st Cir.1991).

The components of the clean-up project requiring Army Corps approval include the following: construction of a seawall along the eastern shore of Deer Island to prevent

flooding of a proposed wastewater treatment plant; construction of a five-mile inter-island tunnel to carry preliminarily treated wastewater from the grit removal facility in Quincy to a new secondary treatment facility at Deer Island; construction of a nine-mile effluent outfall tunnel to carry treated wastewater from Deer Island for discharge into Massachusetts Bay; and—the only activity relevant to this litigation—construction of a residuals landfill at the Walpole site. The basis for the Corps' jurisdiction is that construction of the landfill will require filling a 600–square–foot, man-made wetland area, formerly used by the Massachusetts Department of Corrections as part of an obstacle course for training prison guards. The Army Corps issued the permit and the 37–page record of decision accompanying it on February 11, 1991, and the Towns instituted the instant action.

Judicial review of agency actions such as this is generally limited to the administrative record before the agency at the time it made its decision. In this case, the record contained the memoranda of one Army Corps official who was quite critical of the Walpole site and another internal memorandum that led the Towns to believe that the Department of Justice and EPA had unduly influenced the Corps' decision to issue the permit. The Towns subpoenaed the record keepers of EPA and the Justice Department to appear for depositions and sought discovery of documents reflecting communications among these executive agencies and the Corps. The defendants promptly moved for a protective order, and the Towns moved to compel discovery; in response, I ordered the defendants to submit to the court for *in camera* inspection all documents responding to the subpoena. On the basis of this inspection, I concluded that the documents were properly excluded from the administrative record and did not include sufficient indicia of bad faith to require looking beyond the administrative record. Memorandum & Order of June 19, 1991, 137 F.R.D. 183. I therefore allowed

the protective order, denied the order to compel, and sealed and impounded the documents. *Id.*[1]

## II

The statutes and regulations governing this action first came into being with the enactment of the Federal Water Pollution Control Act Amendments of 1972, now known as the Clean Water Act. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of dredged or fill material into the navigable waters of the United States without a permit issued under § 404(b)(1), 33 U.S.C. § 1344(b)(1). The guidelines for issuing such permits are codified at 40 C.F.R. pt. 230 [hereinafter Guidelines]. The definition of "waters of the United States" in the Guidelines includes wetlands. 40 C.F.R. § 230.3(s)(7). *See also id.* § 230.3(t) (defining "wetlands"); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (discussing Corps' interpretation of "wetlands"). Most importantly, § 230.10 of the Guidelines contains "four conditions which must be satisfied in order to make a finding that a proposed discharge of dredged or fill material complies with the Guidelines." 40 C.F.R. § 230.4. The § 230.10 conditions are at the heart of this dispute.

The Army Corps must also perform a "public interest review" of all permit applications pursuant to 33 C.F.R. § 320.4(a). The public interest review is also pertinent in the instant case.

This court's review of the Army Corps' decision to issue any permit is governed by § 706 of the Administrative Procedure Act, 5 U.S.C. § 706. The court must set aside the agency decision if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). In explaining how to apply this standard, the Supreme Court has said,

---

1. Prior to ruling on these motions, I denied the Towns' motion to disqualify the trial judge.

Memorandum & Order of May 21, 1991.

To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted).

■ In performing this review, the court generally constrains itself to the record that was before the agency when it made the decision. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989). There may be circumstances in which a reviewing court is obliged to look beyond the administrative record, but I have previously decided that such circumstances are not present here. *See* Memorandum & Order of June 19, 1991, at 187–189. Moreover, having reviewed the record of decision and the administrative record for this permitting decision, I conclude that it is not necessary to inquire outside the record to explain the Corps' decision. *See Friends of the Earth v. Hintz,* 800 F.2d 822, 829 (9th Cir.1986).

Summary judgment is appropriate in a case challenging agency decisionmaking, as in all other cases, where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the record in its entirety in the light most favorable to the nonmoving party and indulge all inferences in that party's favor. *Moreau v. Local 247, Int'l Brotherhood of Firemen,* 851 F.2d 516, 519 (1st Cir.1988). In order to create a triable issue of fact, the nonmovant must set forth specific facts. Fed.R.Civ.P. 56(e). "Unsupported allegations are insufficient to create a genuine dispute." *Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir.1990).

## III

Court I of the Towns' complaint alleges that the Army Corps' decision to issue the permit violated the § 404(b)(1) Guidelines. The Towns' brief stresses several deficiencies of the permitting process, and I discuss these *seriatim.*

### A. Analysis of Practicable Alternatives

The Guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.-10(a). Moreover, where, as here, the activity for which a permit is sought "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

Before choosing the Walpole site for the residuals landfill, MWRA screened approximately 300 sites, analyzing them for different technological mixes. EPA independently assessed the screening process in its EIS for the residuals management plan.[2] The Army Corps' record of decision for permit no. 199000033 recounts this screening process. *See* Record of Decision at 9–11, Admin.R.Doc. No. 97 (Defs.' Ex. 5) [hereinafter ROD]. The Corps concluded that EPA's analysis of alternatives satisfied § 230.10(a)'s practicable alternatives test. ROD at 11. The ROD explained the Corps' findings regarding the practicable alternatives analysis as follows:

---

**2.** EPA was the lead agency for the NEPA review, with primary responsibility for preparing the EIS; the Army Corps acted as a cooperating agency. *See* Letter to Col. Thomas A. Rhen from Michael R. Deland (Aug. 15, 1986), Admin.R.Doc. No. 325 (Defs.' Ex. 1); *see also* 40 C.F.R. §§ 1501.5–.6 (defining lead and cooperating agencies).

Aquatic ecosystem effects associated with the proposed Walpole–MCI site are the following: direct filling of 600 square feet of man-made, low-value wetlands, and potential secondary effects emanating from the landfill to adjacent wetlands and waters. It's the Corps [sic.] determination that the elimination of the 600 square feet is an inconsequential impact. In fact, this project viewed in isolation could possibly have qualified for Nationwide Permit # 26 as the wetland is isolated and the project impacts less than one acre. Therefore, the Corps concludes that no other alternative would have any material environmental advantage, (i.e. be less environmentally damaging to the aquatic ecosystem) than the proposed Walpole–MCI site.

*Id.* The Corps concluded, "The proposed Walpole–MCI landfill site is the least environmentally damaging practicable alternative to the aquatic ecosystem." *Id.* at 14. Notably, the Corps did not take groundwater effects into consideration in its § 230.-10(a) analysis. It reasoned that "the consideration of ground water effects are [sic.] appropriately conducted in the context of the Corps' public interest review as ground water is generally not encompassed by Section 404 of the Clean Water Act as Water of the U.S." *Id.* at 13.

1. Consideration of Groundwater under § 230.10(a)

■ The Towns contest the Corps' practicable alternatives analysis for many reasons. Most importantly, the Towns are concerned with the Corps' decision to exclude groundwater effects from its alternatives analysis. The landfill's impact on groundwater is a major concern because the landfill site lies near[3] the recharge area for the EPA-designated Head of Neponset Sole–Source Aquifer, which is the sole water supply for the Town of Walpole; the landfill site is also near the recharge zones of several drinking-water wells in the area. The Towns argue that, had the Corps taken the groundwater effects into account, it could not possibly have concluded that the Walpole site was the least environmentally damaging practicable alternative.

The Towns argue, in effect, that the Corps incorrectly applied its own Guidelines. The threshold issue is whether the Corps was correct in its determination that effects on groundwater should not be analyzed under § 230.10(a).

■ An agency's interpretation of the regulations it is charged with administering is entitled to deference. *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980). On the facts of this case, the Corps' application of § 230.10(a) was clearly reasonable. This section calls for the Corps to compare practicable alternatives on the basis of their "adverse impact on the *aquatic ecosystem*" (emphasis added). Once this is done, the Corps is to select from among practicable alternatives that with the least adverse effect on the aquatic ecosystem, unless that alternative has "other significant adverse environmental consequences." The plain language of the Guidelines clearly constrains the alternatives analysis, in the first instance, to effects on the aquatic ecosystem. "Aquatic ecosystem," in turn, is defined as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. § 230.3(c). The Corps' determination that groundwater sources are not aquatic ecosystems was clearly a reasonable interpretation of § 230.10(a), as aquifers and wells cannot be said to "serve as habitat for interrelated and interacting communities and populations of plants and animals." While the impact on groundwater is certainly an "environmental consequence," the alternatives analysis is limited to comparison of effects on the aquatic ecosystem.

■ Of course, the court must reject a construction of a regulation that is clearly at odds with statutory language or congressional intent. *Chevron U.S.A. Inc. v.*

---

**3.** The Towns believe that the site in fact lies *within* the recharge area boundary, and they have petitioned the EPA for redesignation of the boundary lines. *See* Pls.' Ex. 4.

*Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 2781–82, & n. 9, 81 L.Ed.2d 694 (1984). The Corps' interpretation of the alternatives test, however, is not contrary to the mandate of the statute or the intent of Congress, even though Congress defined "navigable waters" broadly. *See* 33 U.S.C. § 1362(7); *Riverside Bayview Homes,* 474 U.S. at 133, 106 S.Ct. at 462. If Congress indeed intended to protect groundwater sources, the Corps' failure to consider groundwater in the practicable alternatives test does not thwart that intent. In fact, the Guidelines do appear to take groundwater into account, not in § 230.10(*a*), which is concerned with the aquatic ecosystem, but rather in § 230.10(*c*), which prohibits the issuance of permits that "will cause or contribute to significant degradation of the waters of the United States." The § 230.-10(c) analysis is not limited to aquatic ecosystems, but rather includes "effects on municipal water supplies." 40 C.F.R. § 230.10(c)(1).

In their briefs, the parties argue at length whether Congress intended to include groundwater within the definition of "waters of the United States." I need not enter into this debate, however, as I conclude on the facts of this case that the Guidelines do in fact take groundwater supplies into account under § 230.10(c). In fact, the Corps gave lengthy consideration to groundwater effects. *See infra* part III.C.

2. Substantive Review of Alternatives Analysis

■ In addition to challenging the exclusion of groundwater from the § 230.10(a) analysis, the Towns assert that the Corps' ultimate determination that the Walpole site satisfied the practicable alternatives test was arbitrary and capricious. The Towns argue that the Corps did not perform an alternatives analysis rigorous enough to satisfy § 230.10(a), that the Corps failed adequately to consider secondary impacts on wetlands, and that the Corps failed to take into account certain practicable alternatives that were not considered in MWRA's screening process.

The Towns argue that § 230.10(a) provides for a more rigorous alternatives analysis than that performed by EPA in its EIS. In addition, the Towns point to the presumption in § 230.10(a)(3) that practicable alternatives not involving wetlands are available. The Towns argue that these regulations require the Corps to demonstrate clearly and convincingly that no practicable alternative less damaging to the aquatic ecosystem exists and that the Corps failed to do so.

The Corps, on the other hand, argues that the § 230.10(a) standard is variable depending on the activity in question and that in this case a less rigorous review was appropriate. To support this position, the defendants point to an introductory section of the Guidelines, entitled "Adaptability," which reads as follows:

The manner in which these Guidelines are used depends on the physical, biological, and chemical nature of the proposed extraction site, the material to be discharged, and the candidate disposal site, including any other important components of the ecosystem being evaluated.... These Guidelines allow evaluation and documentation for a variety of activities, ranging from those with large, complex impacts on the aquatic environment to those for which the impact is likely to be innocuous. It is unlikely that the Guidelines will apply in their entirety to any one activity, no matter how complex. It is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment. It generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in such routine cases.

40 C.F.R. § 230.6. The adaptability of the Guidelines is again mentioned in the short introductory note to § 230.10, which states that "the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities."

It is undisputed that the only wetland *directly* affected by the landfill is a 600–square–foot, man-made wetland that was used by the Department of Corrections as part of an obstacle course. It was not an abuse of discretion for the Corps to conclude that it need not study alternatives to the Walpole site in great detail to fulfill the requirements of § 230.10(a), when it concluded that the proposal would have an "inconsequential impact" on the aquatic ecosystem. ROD at 11.

Nor did the Corps err in adopting the alternatives analysis performed in the NEPA review. *See id.* at 13. The Guidelines contemplate that "the analysis of alternatives required for NEPA environmental documents ... will in most cases provide the information for the evaluation of alternatives under these Guidelines." 40 C.F.R. § 230.10(a)(4). The same section recognizes that the NEPA analysis in some cases may not be sufficiently detailed, but that in other cases it will be broader in scope than the analysis required by the Guidelines. Acting on the uncontested belief that the 600–square–foot wetland area was an inconsequential loss, the Corps was clearly reasonable to adopt the NEPA analysis.

The Towns also argue that the Corps' consideration of secondary effects of the proposed landfill was insufficient. While the Corps determined that § 230.10(a) does not require an assessment of groundwater effects, it did consider adverse effects on the aquatic ecosystem to include "secondary" effects on wetlands. ROD at 12. *Cf.* 40 C.F.R. § 230.41 (noting that "[w]hen disruptions in flow and circulation patterns occur, apparently minor loss of wetland acreage may result in major losses through secondary impacts" and that discharge of fill material "may modify the capacity of wetlands to retain and store floodwaters and to serve as a buffer zone shielding upland areas from wave actions, storm damage and erosion").

The ROD specifically considered such secondary effects on adjacent wetlands, focusing on the degradation of water quality caused by possible leakage of leachate from landfill cells and on loss or disruption of surface and groundwater recharge. ROD at 12. It concluded that "overall affects [sic] of [the] project are inconsequential." *Id.* The Towns find fault with the Army Corps' reliance on the relatively small size of the landfill, criticize the ROD for failing to specify mitigation measures, and accuse the Corps of ignoring a certified vernal pool just outside the landfill footprint.

A review of the ROD, however, indicates a fairly detailed consideration of secondary impacts. Although the Guidelines warn that a relatively small discharge can have disproportional effects, the Corps determined that this was not the case here. Particularly, the Corps noted that "[t]he applicant has committed to develop a plan to capture the rainfall and return it to the wetlands directly adjacent to the landfill to protect their hydrology." *Id.* Moreover, the ROD notes,

In any event, the development of the landfill will include elaborate monitoring of baseline conditions of the adjacent wetlands, modelling of the water flows, and a collection and replacement system to return the water to the wetlands. A portion, based on the modelling, will be returned as surface water, and a portion will be returned as ground water via an infiltration system. This type of mitigation plan has in fact been done before by the applicant's consultants on other projects. The Corps will have approval authority over the monitoring and mitigation program through a special condition of the permit, to insure the applicant's commitment to replicate existing flow conditions to maintain the viability of the adjacent wetlands is carried out.

*Id.*

The fact that the vernal pool was not specifically mentioned is insignificant. Clearly it was included in the Corps' consideration of "adjacent wetlands"; the ROD explicitly noted that "[e]xtensive areas of forested wetland hydrologically connected to the Stop River surround the site including a vernal pool near the western boundary of the site in the southern extreme of

Wetland A approximately 150' from the landfill boundary." *Id.* at 5. The Corps considered adjacent wetlands—including the vernal pool—in its alternatives analysis; it did not unreasonably conclude that the secondary effects were inconsequential.

In addition, the Towns argue that the Corps' practicable alternatives analysis must be flawed because there are many alternatives that would have less severe environmental consequences than the Walpole site. The Towns point out that the MWRA itself recognized that the runner-up candidate site for the landfill, Rowe Quarry, had less adverse environmental effects than Walpole.[4]

A review of the ROD, however, satisfies the court that the Corps reasonably determined that the Walpole site was the "least environmentally damaging practicable alternative to the aquatic ecosystem." *Id.* at 14. The Corps noted that both Walpole and Rowe Quarry "were considered environmentally acceptable, and the MWRA Board of Directors selected Walpole–MCI." *Id.* at 11. The ROD basically adopted the MWRA decision as sufficient to meet the § 404(b)(1) Guidelines standard. Given the Corps' determination that the elimination of 600 square feet of man-made wetlands and the secondary effects associated with the Walpole landfill would be minimal, its reliance on the MWRA's decision was not an abuse of discretion. Moreover, the record reflected that the Rowe Quarry site was not a "practicable" alternative. Letter to Col. Stanley J. Murphy from David A. Fierra (Nov. 2, 1990) at 5 n. 4 (Defs.' Ex. 21).

Finally, the Towns point to a recently completed study by the Harbor Residuals Landfill Siting Advisory Commission dated August 7, 1991 (Pls.' Ex. 8). The Commission was appointed by Governor William F. Weld to identify viable sites or technologies as alternatives to the Walpole site. The Commission identified, according to the Towns, "at least six viable alternatives to the Walpole–MCI Site, all of which are superior under the § 230.10(a) standard." Joint Mem. ... in Opp'n to Defs.' Mot. for Summ. J. at 29 [hereinafter Pls.' Brief].[5] The Corps cannot be faulted for not considering the report of the Governor's Commission, however, as the Commission was not even in existence until after the ROD and the permit were issued.

In conclusion, I find that the Corps' determination that the Walpole site satisfied § 230.10(c)'s practicable alternatives test was based on a consideration of relevant factors and was reasonable. There is no genuine issue of material fact to preclude this conclusion.

## B. Effects on Wildlife

■ The Towns argue that the issuance of the permit also violated § 230.10(b) of the Guidelines in that it failed to take into account the effect of the project on populations of pied-billed grebes, wood ducks, and great blue herons near the landfill site.

The Towns submitted to the Corps evidence of the effects of the landfill on wildlife near the site. *See* Letter to Karen Kirk Adams from Stephen D. Anderson (Aug. 9, 1990), "Exhibit C" at 8, Admin.R.Doc. No. 226 (Defs.' Ex. 10). The information indicated that a productive rookery of great blue herons, recently removed from the state list of rare birds, was within 1,100 feet of the landfill. It also indicated that pied-billed grebes, listed by the Commonwealth as a threatened species, and wood ducks, protected by the Migratory Bird Treaty Act, used the area. The ROD acknowledged this information: "The increased noise and activity during construction and operation of the landfill may

---

4. Although the Towns draw no distinction between environmental effects in general and effects on aquatic ecosystems, as they must under § 230.10(a), I assume that the Towns mean to assert that the Rowe Quarry site involves less adverse effects on the aquatic ecosystem than does Walpole, and that Rowe Quarry does not have other significant environmental drawbacks.

5. In fact, the Commission reviewed eighteen alternative landfill sites and determined that "no single new landfill site comparable to Walpole appears feasible." Report to the Governor at ES–2 (Pls.' Ex. 8). The alternatives suggested involved different combinations of technologies and privately-owned disposal facilities.

adversely impact one of the state's largest Great Blue Heron rookeries and several pied-billed grebes, a state threatened bird in the Stop River impoundment a quarter of a mile away." ROD at 7. *See also id.* at 16 (assessing effects on wildlife in context of public interest analysis).

■ The Towns argue that this mere acknowledgement, without further comment or evaluation, fails to satisfy § 230.-10(b). The Towns, however, misread the Guidelines when they assert that § 230.-10(b) controls. That section of the regulations reads, in pertinent part, "No discharge of dredged or fill material shall be permitted if it: ... [j]eopardizes the continued existence of species listed as endangered or threatened *under the Endangered Species Act of 1973*" (emphasis added).

There is no claim that the Endangered Species Act is implicated by the landfill site.[6] Rather, the Towns assert that the Corps is required to consider under § 230.-10(b) species listed as threatened or endangered by individual states. While it is true that the Corps must consider such lists in its permit process, *see* 40 C.F.R. § 230.-30(a), the proper section for this review is § 230.10(*c*), which prohibits discharges that "will cause or contribute to significant degradation of the waters of the United States." Significant degradation includes "effects on municipal water supplies, plankton, fish, shellfish, *wildlife*, and special aquatic sites." *Id.* § 230.10(c)(1) (emphasis added).

Thus, the Towns err in asserting that the Corps did not properly account for the pied-billed grebe in the § 230.10(b) analysis; nonetheless, I hold that the effects on wildlife, including state-designated threatened species, must be considered under § 230.-10(c). The question is whether the Corps found, or failed to consider, whether the

project will have a significant effect on these species.

The plaintiffs' exhibits include a report of one of their consultants, forwarded to the Corps, which dealt with effects on wildlife. *See* Letter to Peter Kube from John W. Giorgio (Aug. 10, 1990), App. "E" (Pls.' Ex. 1). That report focuses on two adverse effects on wildlife: contamination of the Stop River impoundment by the flow of contaminated surface waters and disturbances caused by construction and operation of the landfill. *Id.* at 7–8. As to the former, the Corps determined that the risk of contamination from surface water runoff was minor. ROD at 12. As to the latter, the plaintiffs' own exhibit states that although herons "tend to prefer more remote, serene habitats," they "are generally tolerant of noise and other human disturbances," Giorgio Letter, App. "E" at 7, and that "the Heron is generally more sensitive to noise and other disturbances than the Grebe or Wood Duck," *id.* at 8.

Although the ROD does not specifically find that the effects on wildlife are "insignificant" under § 230.10(c) standards, the Corps did make this finding in issuing the permit. *See* Short Form, Section 404(b)(1) Guidelines Compliance Determination (Feb. 5, 1991) at 1, Admin.R.Doc. No. 97 [hereinafter Short Form].[7] The ROD shows that the Corps did not overlook the birds in deciding to issue the permit. The Corps found that the construction activity "may adversely impact" the blue heron rookery and the grebe. ROD at 7. In addition, the Corps' public interest analysis specifically took the grebe and the heron into account, concluding that the landfill's effects on wildlife would be generally adverse in the long term. *Id.* at 16. The record demonstrates that the Corps was aware of these negative effects, but nonetheless did not find "significant degradation" of the wa-

---

6. The Massachusetts threatened-species list shows that the U.S. Department of the Interior does *not* list the pied-billed grebe as "endangered" or "threatened." Mass.Regs.Code tit. 321, § 8.01(3)(b) (1990) (Pls.' Ex. 10).

7. The defendants' reply brief cited the Short Form as Defendants' Exhibit 5, but it was not

included in the exhibits filed with the court. The Short Form is, however, included in the administrative record (Admin.R.Doc. No. 97), which, incidentally, is stored in a file cabinet in the copy room of the U.S. Attorney's office on the eighth floor of the federal courthouse building.

ters of the United States. While this finding could have been better documented, the conclusion was not unreasonable.

### C. Effects of Municipal Water Supplies

In addition to arguing that the Corps failed to consider the effects on groundwater in its alternatives analysis, *see supra* part III.A, the Towns further argue that the Corps failed to conduct a proper analysis of groundwater under § 230.10(c)'s "significant degradation" test.

■ The Corps in its reply brief argues that it need not consider groundwater under § 230.10(c) because groundwater is not included in "waters of the United States." In my view, this approach is clearly contrary to the Guidelines, which specifically list "effects on municipal water supplies" among "effects contributing to significant degradation." *See* 40 C.F.R. § 230.10(c)(1). It is undisputed that groundwater in the vicinity of the Walpole site is connected to municipal water supplies. Given this fact, the Corps must consider effects on groundwater in the § 230.10(c) analysis.

■ Perhaps anticipating this ruling, the Corps' reply brief notes that the Corps specifically found in its Short Form, *see supra* note 7 and accompanying text, that the activity would not cause or contribute to significant degradation of the waters of the United States; the basis for this finding, the Corps points out, is set forth in pages 26–30 of the ROD. Reply Mem. of Defs. at 16 n. 10. While the Corps concedes that these findings were included in the ROD as part of the public interest review, it argues that the findings clearly demonstrate that the Corps took a "hard look" at groundwater issues sufficient to support its conclusion in the Short Form that the project does not cause or contribute to significant degradation of the waters of the United States.

The ROD discusses at great length—no subject is given more careful attention—the possible effects of leaks in the landfill

on nearby drinking water supplies, including ten private wells near the site, larger wells 3,500 feet away that supply drinking water to the adjacent prisons, a well supplying a hospital in the vicinity, and the Head of Neponset Sole–Source Aquifer. The ROD indicates that the Corps evaluated the tests performed by the EPA and the MWRA for the EIS and, where necessary, conducted its own tests.

In the argument section of their brief, the Towns do not specifically address their perceived shortcomings with the ROD's analysis of groundwater issues. Rather, the Towns focused on the Corps' failure to consider groundwater in its alternatives analysis and its refusal to discuss groundwater in the context of § 230.10(c). The Towns' objections to the Corps' groundwater analysis, however, are summarized in the fact section of their brief. *See* Pls.' Brief at 6–9.[8]

The Towns' objections are voiced eloquently and authoritatively by David H. Killoy, a branch chief of the Corps' Regulatory Division, who was a strong critic of the Walpole site during the Corps' internal deliberations. Killoy made his views known to the Corps in two lengthy memoranda that are part of the administrative record, *see* Memorandum dated 24 December 1990, Admin.R.Doc. No. 59 (Defs.' Ex. 25); Memorandum dated 23 January 1991, Admin.R.Doc. No. 117 (Defs.' Ex. 24); his objections also appear in some notes dated 9 January 1990 supplied to the court by the plaintiffs (Pls.' Ex. 7). Killoy's objections, as summarized by the Towns in their brief, focus on three shortcomings of the analysis: (1) failure to take into account the degradation of down-gradient wetlands by depletion of the water supply; (2) lack of information regarding bedrock deposits at the site; and (3) lack of analysis of the nearby private wells. *See* Pls.' Brief at 8. Killoy also disagreed with the Corps' decision not to consider groundwater in the practicable alternatives analysis. *Id.*

**8.** In addition, the ROD itself summarizes the Towns' objections that are based on groundwa-ter impacts. *See* ROD at 21–22.

The Corps adequately addressed each of Killoy's three points that were relevant in the degradation of the waters analysis. As to the down-gradient wetlands, the Corps was satisfied that MWRA's mitigation plan would prevent adverse effects on adjacent wetlands. ROD at 25. In addition, the Corps specifically noted the Towns' concerns that MWRA's and EPA's analyses of the effects on the nearby prison wells and privately owned wells did not take bedrock patterns into account. *Id.* at 21. As to the private wells, the Corps acknowledged that MWRA had failed to discuss the bedrock transport of pollutants, but it was satisfied with MWRA's commitment to supply water to the affected well owners. *Id.* at 26. As to the prison wells, the Corps noted a possible connection from the landfill through a ridge of bedrock, but concluded that the work required to analyze this was "very to impossibly large." *Id.* at 27. The Corps determined, at length, that because of the landfill's double liner, the likely direction of groundwater flow, and the chemical analysis of a hypothetical leak, the threat of contamination of the prison wells was minor. *Id.* at 28. The record indicates that the Corps adequately analyzed groundwater impacts and reasonably concluded that there was not a threat of significant degradation. Section 230.10(c) was satisfied.

## D. *Evidence of Arbitrariness, Caprice, or Bad Faith*

The Towns also take issue with the manner in which the Corps arrived at its conclusions about the groundwater. In response to the Towns' and Killoy's objections, the Corps ordered an independent analysis of groundwater supplies. The analysis was performed by the Corps' Hydraulics and Water Quality Branch, which submitted a report dated February 6, 1991, Admin.R.Doc. No. 106 (Defs.' Ex. 26), concluding that "the risk to drinking water supplies from the landfill is minor."

The Towns say that the report "was commissioned for the purpose of producing re-

sult oriented findings to satisfy the heavy pressure being applied by the Department of Justice and EPA" and that it was "a self-serving document which was used later to justify a pre-determined decision to site the landfill in Walpole." Pls.' Brief at 9. After reviewing this report, however, I find that it is a 23–page (excluding the list of references), in-depth discussion of groundwater issues, taking into account the comments of the Towns and their consultants. Having reviewed *in camera* the communications between the Corps, the Justice Department, and the EPA, I do not believe that there is a factual basis for the Towns' allegations of conspiracy and bad faith. The "credibility" of the Hydraulics and Water Quality Branch's report is not an issue, *cf. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (stating that determinations of credibility are unsuited for summary judgment); the report makes it clear that the Corps took the Towns' concerns seriously. The decision to issue the permit, after taking these concerns into account, was not arbitrary or capricious.[9]

## E. *Public Interest Review*

■ Finally, the Towns object to the Corps' performance of its public interest review mandated by 33 C.F.R. pt. 320. The Towns argue that this review was flawed because the Corps put too much weight on the compelling public interest in cleaning up Boston Harbor and too little emphasis on the destruction of wetlands.

The Corps is required to consider myriad factors in making its public interest determination and to balance carefully expected benefits against foreseeable detriments. *See* 33 C.F.R. § 320.4. "[A] permit will be granted unless the district engineer determines that it would be contrary to the public interest." *Id.* Here, the Corps considered and rated the factors listed in the regulations, *see* ROD at 14–19, and concluded that the project is not contrary to

---

9. The Towns raise the specter of bad faith as to the entire permitting process, not just the groundwater analysis. For the reasons just stated, I reject the Towns' conspiracy theory as

unfounded; neither the administrative record before me nor my *in camera* review of material outside the record indicates otherwise.

the public interest, *id.* at 37. Considering the necessity of the landfill in the overall clean-up project, the MWRA's history of difficulty in acquiring *any* site, *see Metropolitan Dist. Comm'n,* 757 F.Supp. at 124–26, as compared with what the Corps determined to be insignificant effects on wetlands, the Corps' conclusion that the project is not contrary to the public interest was justified.

### IV

Count II of the Towns' complaint alleges that the Corps violated NEPA in reviewing the permit application. The Towns' argument is based in part on the fact that the Corps relied on the EPA's EIS in issuing the permit, when the EIS did not contain all pertinent information that the Corps was required to analyze. To the extent that the Corps relied on the EIS created in the NEPA review process, I have already concluded that it acted reasonably and within the Guidelines. *See supra* p. 687. Otherwise, I construe the complaint to charge that the Corps violated NEPA because it failed to prepare a *supplemental* EIS in light of new factual information. *See Aldridge,* 886 F.2d at 460; *Massachusetts v. Watt,* 716 F.2d 946, 948 (1st Cir.1983).

A supplemental EIS is required if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.-9(c)(ii). The Towns state that new information relating to wetlands and groundwater impacts was submitted to the Corps after the EPA's record of decision under NEPA was issued. Pls.' Brief at 38–39. I assume that the Towns here are referring to the "newly discovered information ... contained primarily in a technical report prepared by the Town of Walpole's consultant, R.W. Gillespie & Associates ('Gillespie Report') dated December 11, 1990." Pls.' Brief at 5. The Gillespie Report was attached to the brief as Plaintiffs' Exhibit 4.

The Corps argues that the issue of whether the Gillespie Report warranted a supplemental EIS is *res judicata* because the Towns could have raised this issue in the NEPA cases. *See Dowd v. Society of St. Columbans,* 861 F.2d 761, 763 (1st Cir. 1988). The Towns in fact *did* raise this issue in the earlier case, *see Town of Norfolk,* 761 F.Supp. at 878, but I held, based on the evidence then available, that the question was premature. Thus, as the claim could not have been decided in the earlier case, I will consider it here.

The Corps specifically considered the Gillespie Report. *See* ROD at 28 (noting existence of Towns' petition to redesignate aquifer boundary). The Corps believed that it was bound to consider this new information, but it concluded in light of this information that the risk to the drinking water supplies of the aquifer was minimal. *Id.* at 29. The ROD explains the reasons for this conclusion over the next two pages. *Id.* at 29–30.

The decision whether to issue a supplemental EIS is governed by a standard of reasonableness under the circumstances. *Watt,* 716 F.2d at 948. Based on the findings in the ROD that the potential threat to drinking water, even in light of the new evidence, was insignificant, the Corps' decision not to issue a supplement was reasonable.

### V

In conclusion, there is no genuinely disputed issue of material fact that prevents me from concluding that the Army Corps properly applied its § 404(b)(1) Guidelines, reasonably concluded that the project was not contrary to the public interest, and complied with NEPA. Summary judgment shall therefore enter for the defendants on all counts.

SO ORDERED.