USCA1 Opinion

 

 July 15, 1992 ____________________ No. 91-2215 TOWN OF NORFOLK AND TOWN OF WALPOLE, Plaintiffs, Appellants, v. UNITED STATES ARMY CORPS OF ENGINEERS, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Campbell and Bownes, Senior Circuit Judges. _____________________ _____________________ Stephen D. Anderson for appellant Town of Norfolk and John ___________________ ____ W. Giorgio for appellant Town of Walpole, with whom Leonard ___________ _______ Kopelman, Kopelman and Paige, P.C., Anderson & Kreiger, ________ ____________________________ _____________________ Christopher H. Little and Tillinghast, Collins & Graham, were on _____________________ _____________________________ brief. George B. Henderson II, Assistant United States Attorney, _______________________ with whom Barry M. Hartman, Acting Assistant Attorney General, _________________ Environment and Natural Resources Division, Wayne A. Budd, United _____________ States Attorney, William B. Lazarus, Stephen L. Samuels, _____________________ _____________________ Elizabeth Yu, Attorneys, Department of Justice, Steven H. _____________ __________ Goldberg, of counsel Gary Pasternak, Assistant District Counsel, ________ ______________ Department of the Army, Corps of Engineers, were on joint brief for appellees United States Army Corps of Engineers and Massachusetts Water Resources Authority. ____________________ ____________________ -2- TORRUELLA, Circuit Judge. On this appeal, the Towns of _____________ Walpole and Norfolk challenge the decision of the U.S. Army Corps of Engineers ("Corps") to issue a permit under Section 404 of the Clean Water Act1 to allow the Massachusetts Water Resources Authority ("MWRA") to place fill in an artificial wetland located in the Town of Walpole and adjacent to the Town of Norfolk.2 The district court, in a comprehensive opinion, found that the Corps' determinations under Section 404 were not arbitrary, capricious or otherwise not in accordance with law and therefore it granted summary judgment in favor of the Corps, its district engineer for New England, and the MWRA (collectively referred to herein as defendants). Norfolk & Walpole v. U.S. Army Corps of _________________ __________________ Engineers, 772 F. Supp. 680 (D. Mass. 1991). _________ In addition, the Towns challenge (1) the district court's decision to allow a motion by defendants to quash subpoenas and for a protective order to prevent discovery of certain documents3 and (2) the district court judge's denial of the Towns' motion for his recusal pursuant to 28 U.S.C. ____________________ 1 33 U.S.C. 1344. 2 In a related appeal, the Towns challenged the adequacy of the supplemental environmental impact statement prepared by the United States Environmental Protection Agency ("EPA") for the proposed landfill. Norfolk v. United States EPA, 761 F. Supp. _______ _________________ 867 (D. Mass. 1991). We affirmed the district court's grant of summary judgment in favor of the EPA and its Administrator. 3 Norfolk & Walpole v. U.S. Army Corps of Engineers, 137 F.R.D. _________________ ____________________________ 183 (D. Mass. 1991). -3- 455(a).4 We affirm the rulings and decisions of the district court for the reasons that follow. I A. Factual Background A. Factual Background __________________ This appeal is an offspring of the colossal effort to clean up Boston Harbor. This particular controversy -- involving the issuance of a permit to construct and operate a landfill in Walpole -- has been described elsewhere in detail.5 We therefore summarize the facts pertinent to this appeal. Pursuant to a compliance plan approved by the District Court for the District of Massachusetts to abate the discharge of inadequately treated wastewater and sewage sludge and other residuals into Boston Harbor, the MWRA was required, among other remedies, to construct and operate a landfill by March 1994 to hold grit, screenings and, if necessary, digested or heat-dried sludge from its wastewater treatment facilities. See generally ___ _________ United States v. Metropolitan Dist. Comm'n, 23 Env't Rep. Cas. ______________ __________________________ 1350 (D. Mass. 1985). In 1986 the MWRA began to work closely with the U.S. Environmental Protection Agency (EPA) to find possible alternatives for both sludge management technologies and ____________________ 4 Section 455(a) provides: Any justice, judge, or magistrate of the United States shall disqualify himself, _____ in any proceeding in which his impartiality might reasonably be questioned. 5 United States v. Metropolitan Dist. Com., 757 F. Supp. 121, _____________ _______________________ 123-26 (D. Mass. 1991), aff'd, 930 F.2d 132 (1st Cir. 1992). _____ -4- potential sites for the landfill. Eventually four technologies and ten potential sites were identified from a field of 299 sites. Additional evaluation was conducted to further screen the potential sites for detailed analysis. The criteria used at this stage of the screening included environmental standards, such as ecology and air quality and potential groundwater effects, and non-environmental criteria, such as cost and the extent to which potential communities were already hosting permanent wastewater treatment facilities. This screening stage eliminated four sites on environmental and other grounds. Of the remaining six sites, four were further evaluated for sludge processing, while two sites -- Rowe Quarry and MCI-Walpole -- were further evaluated for a landfill operation. In February of 1989, the MWRA issued its Draft Environmental Impact Report and Draft Residuals Management Facilities Plan ("DEIR"). The MWRA proposed to process sludge at the Fore River Staging Area in Quincy, Massachusetts and to landfill the residuals at the MCI-Walpole site. In May of 1989, EPA issued a Draft Supplemental Environmental Impact Statement ("DSEIS"). In its analysis of the proposed landfill at Walpole, EPA identified two major critical groundwater supplies. First, the Massachusetts Department of Corrections maintains a number of public water supply wells located in the Charles River Watershed Aquifer to the west of the proposed landfill. These wells supply drinking water to the MCI-Norfolk and MCI-Walpole prison -5- facilities. Second, to the east of the landfill site is the head of the Neponset Sole Source Aquifer.6 This sole source aquifer serves several wells that are the only source of drinking water to the residents of the Town of Walpole.7 EPA concluded that the nearest of these wells is located more than two miles from the landfill site and is separated from the landfill by soils of low permeability. In March 30, 1990, EPA formally approved the construction and operation of the landfill at the Walpole site. Pursuant to Section 404 of the Clean Water Act,8 the Corps is required to review permit applications for proposal to dredge and fill wetlands under the standards set forth in 33 C.F.R. 320.4(a)(1) and 40 C.F.R. 230. In May 1990, the MWRA submitted a revised permit application describing all of its proposed projects to clean Boston Harbor, including the Walpole landfill.9 On July 12, 1990, the Corps issued a public notice ____________________ 6 A sole source aquifer is a designation given by EPA to the principal or sole source of drinking water for a given area. The western boundary of the Neponset Sole Source Aquifer runs to the east of the MCI-Walpole landfill. 7 In addition, south of the landfill are wells that supply drinking water to Southwood Hospital and north of the landfill are wells which supply drinking water to private residences, a horse ranch and a dog kennel. 8 33 U.S.C. 1344. 9 The projects included the construction of a headworks facility for preliminary treatment of sewage on Nut Island, a 5 mile inter-island wastewater tunnel between Nut and Deer Island, a 9.5 mile effluent outfall tunnel and diffuser from Deer Island to offshore waters, a sludge processing facility at Quincy, and the residuals landfill at issue in this case. -6- concerning the MWRA's application, which proposed to set aside forty-six acres of a ninety-four acre plot located in the Town of Walpole and adjacent to the Town of Norfolk. Under MWRA's proposal, a 600 square foot area of man-made wetland located in the center of the proposed project would be filled. This wetland, also known as Wetland E, was created by the Massachusetts Department of Corrections as an obstacle course for training prison guards. The National Marine Fisheries Service and the U.S. Fish and Wildlife Service submitted a comment form indicating no objection to the project. EPA and the MWRA submitted comments in support of the proposed landfill. However, the Towns of Norfolk and Walpole submitted detailed objections to the MWRA proposal. The Towns objected to the proposed landfill essentially on four grounds. First, the Towns claimed that the MWRA had failed to demonstrate that no practicable alternative having less adverse impact on the aquatic ecosystem existed as required under 40 C.F.R. 230.10(a). Second, the Towns argued that the landfill would eliminate over fifty percent of the surface water supply to a portion of an adjacent wetland, thus allegedly causing substantial disruption to the overall wetland resource, including a significant adverse impact on a vernal pool10 located within 100 to 150 feet of the landfill footprint. Third, the Towns alleged that the proposed landfill would adversely ____________________ 10 Vernal pools serve as the sole breeding habitat for certain amphibian species and provide breeding and feeding habitat for a variety of other species. -7- impact wildlife habitats for the great blue heron and the pied- billed grebe. Fourth, the Towns claim that the MWRA disregarded the adverse impact the proposed landfill would have on groundwater resources. David H. Killoy, a branch supervisor of the Corps' Regulatory Division, also opposed the MWRA's application to construct and operate the landfill in Walpole. In a draft memorandum dated December 24, 1990, Mr. Killoy found two unique conditions which, in his opinion, required that the permit be denied because it failed "two parts of the 404(b)(1) guidelines and it is contrary to the public interest."11 First, the MWRA had failed to demonstrate the nonexistence of a practicable alternative to the landfill would have less adverse impact on the aquatic ecosystem. Mr. Killoy concluded that even a small threat to the Neponset Sole Source Aquifer in the area constituted a significant adverse environmental consequence. Second, the discharge of fill may contribute to a significant degradation of the waters of the United States, in this instance, the wells which supply drinking water. Mr. Killoy also noted that in the Corps' review of the Central Artery and Tunnel Project, he had identified a "wide range of sites which were available for land fill."12 In light of the claims by Mr. Killoy and the Towns, the Corps' Regulatory Branch requested its Hydraulics and Water ____________________ 11 Memorandum by David H. Killoy, dated December 24, 1990, at 7. 12 Id. at 6. __ -8- Quality Branch, Water Control Division to examine the available reports and data on groundwater impacts and to prepare a technical report on the potential risk for contamination of the water supplies. The ensuing report recommended that the monitoring system be expanded to include at least one monitoring well to detect any leachate13 escaping towards the Neponset Sole Source Aquifer. The report concluded "that the risk to drinking water supplies from [the Walpole] landfill is minor."14 On January 23, 1991, Mr. Killoy submitted a final memorandum summarizing his continued opposition to the Walpole landfill. Mr. Killoy asserted that the MWRA had not clearly demonstrated that Walpole was the "least environmentally damaging practicable alternative" for the following three reasons. First, if groundwater flow contributed substantially to the nearby down gradient wetlands, then "the removal of 46 acres of groundwater recharge area, high on the groundwater divide, by capping could deplete the wetlands water supply causing a long term degradation."15 Second, the application contained too little information on the location of bedrock and its properties. Third, the investigation "essentially neglected the presence of the [sole source aquifer] and until the final environmental ____________________ 13 Leachate refers to precipitation that will percolate through the residuals placed at the landfill. 14 Report, dated February 1991 at 1, 23. 15 Killoy Memorandum of January 23, 1991, 4. -9- documents ignored the nearby private wells."16 Mr. Killoy, however, concluded with the following observation: I also recognize that many of the items above can be interpreted differently by different reviewers who could recommend issuance of the permit without appearing arbitrary or capricious. This is where the decision maker takes over. Id. at 52. __ Less than three weeks after Mr. Killoy's last memorandum, the Corps issued its Record of Decision ("ROD") granting a permit to the MWRA to inter alia construct and operate _____ ____ the MCI-Walpole landfill. As further elaborated below, the Towns claim that the Corps' permitting process is plagued with errors and that the decision to issue the permit was based on improper pressure by the U.S. Department of Justice and EPA. B. Statutory and Regulatory Background B. Statutory and Regulatory Background ___________________________________ Congress enacted the Clean Water Act17 ("CWA") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a); see also ________ 40 C.F.R. 230.1. Section 301 of the CWA makes the discharge of pollutants into navigable waters unlawful, unless such discharge is authorized by permit. The term "pollutants" is defined broadly and includes dredged or fill material.18 The term "navigable waters" is similarly all encompassing, covering all ____________________ 16 Id. at 14. __ 17 33 U.S.C. 1311(a). 18 33 U.S.C. 1362(6). -10- "waters of the United States." 33 U.S.C. 1362(7). Wetlands are included in the definition of "waters of the United States."19 Section 404 of the CWA authorizes the Corps of Engineers to issue or deny permits for the discharge of dredged or fill material. 33 U.S.C. 1344(a). Generally an applicant seeking a permit under Section 404 submits an individual application for each discharge. In considering permit applications, the Corps is required to apply the regulations and guidelines set forth in Titles 33 and 40 of the Code of Federal Regulations. 33 C.F.R. 320 and 40 C.F.R. Part 230. Section 404(b)(1) of the CWA directs the Corps to apply the guidelines developed by the EPA Administrator in conjunction with the Secretary of the Army, acting through the Chief of Engineers. 33 U.S.C. 1344(b)(1). These Section 404 guidelines are codified at 40 C.F.R. Part 230. Under 33 C.F.R. 320.4(a)(1), the Corps evaluates a permit application's "probable impacts, including cumulative impacts, of the proposed activity on the public interest." 33 C.F.R. 320.4(a)(1).20 The Towns contend that the Corps' ____________________ 19 40 C.F.R. 230.3(s)(7). See also United States v. Riverside ________ _____________ _________ Bayview Homes, Inc., 474 U.S. 121 (1985) (Corps acted reasonably ___________________ in interpreting Clean Water Act to require permits for discharge of material into wetland). 20 Among the factors evaluated under this "public interest review" are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife -11- determination to issue the permit is erroneous under subsections (a), (b) & (c) of 40 C.F.R. 230.10 and under 33 C.F.R. 320.4(a)(1). ____________________ values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, consideration of property ownership and, in general, the needs and welfare of the people. 33 C.F.R. 320.4(a)(1). -12- C. Standard of Review C. Standard of Review __________________ The district court's grant of summary judgment in favor of the defendants is reviewed de novo. See, e.g., Medina & __ ____ ___ ____ _________ Sucesores, Inc., et al. v. Custodio, et al., No. 91-1469, slip ________________________ ________________ op. at 17 (1st Cir. May 7, 1992). Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted if it is clear from the record that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter law." We review the Corps decision to issue the permit under the standard of review set forth in the Administrative Procedure Act,21 pursuant to which an agency's action will be set aside only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To determine whether the Corps's decision complies with the arbitrary and capricious standard, we consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the [Corps]. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, ________________________________________ _____ 416 (1971). See also United States v. Riverside Bayview Homes, _________ _____________ _________________________ Inc., 474 U.S. 121 (1985) ("An agency's construction of a statute ____ it is charged with enforcing is entitled to deference if it is ____________________ 21 5 U.S.C. 706(2)(A). -13- reasonable and not in conflict with the expressed intent of Congress"); All Regions Chemical Labs, Inc. v. U.S. E.P.A., 932 ________________________________ ___________ F.2d 73, 75 (1st Cir. 1991) ("In reviewing EPA's decision we must pay particular attention to the interpretation that it gives its own rules and regulations"); Environmental Coalition Broward ________________________________ County, Inc. v. Myers, 831 F.2d 984, 986 (11th Cir. 1987) _____________ _____ (deference to the Corps' determination is "particularly appropriate in the case of complex environmental statutes such as the Clean Water Act."). II Section 230.10(a) Section 230.10(a) _________________ Section 230.10(a) provides that: no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. 40 C.F.R. 230.10(a). In its Record of Decision, the Corps found that the impact of the Walpole landfill on the aquatic ecosystem to be inconsequential considering the low value of the 600 square foot landfill and the minor potential secondary impacts to adjacent wetlands and waters. The Towns assert that the Corps interpretation of the Section 230.10(a) guidelines is flawed for three reasons. First, the Corps erred in concluding that the direct impacts were "inconsequential." This erroneous conclusion, the Towns assert, reversed the presumption embodied -14- in Section 230.10(a), which requires the Corps to presume that other practicable alternatives exist. Second, the Towns claim that the Corps erred in concluding that the mitigation measures proposed in the MWRA's application would render the secondary impacts to surrounding wetlands "inconsequential." Third, it is alleged that the Corps failed to consider groundwater impacts as part of the practicable alternatives analysis because it erroneously concluded that the term "aquatic ecosystem" as used in Section 230.10(a) generally excludes groundwater. A. Did the Corps Reasonably Conclude that There is No __________________________________________________________ Practicable ___________ Alternative? ___________ The Towns argue that the Corps' conclusion that direct impacts to Wetland E (the 600 square foot, man-made wetland) were inconsequential is not supported by the evidence. This "evidence" consists of a By-Law enacted by the Town of Walpole making Wetland E a protected resource. This argument fails for two reasons. First, and foremost, the Towns failed to make this Wetland By-Law part of the administrative record. We have no way of knowing the terms of this By-Law. Since judicial review of the Corps' permit decisions is limited to the administrative record, the Towns' argument fails. See, e.g., Friends of Earth ___ ____ _________________ v. Hintz, 800 F.2d 822, 830-31 (9th Cir. 1986) (standard of _____ review for the Section 404 permitting process under the Administrative Procedures Act is "highly deferential"); Buttrey _______ -15- v. United States, 690 F.2d 1170 (5th Cir. 1982), cert. denied, _____________ ____ ______ 461 U.S. 927 (1983) ("[Courts] look only to the administrative record in order to determine if the Corps' decision was arbitrary, capricious, or not in accordance with law."). Second, even assuming the inclusion of the By-Law in the administrative record, the fact that Walpole has passed such a By-Law is insufficient to establish that the direct and secondary impacts to the ecosystem are not "inconsequential." Dubbing a piece of real estate "wetland" by municipal edict does not establish such a conclusion de jure for purposes of federal __ ____ law nor does the By-Law grant per se "consequence." We agree ___ __ with the Corps that Walpole's By-Law has no legal significance since the MWRA is not subject to them. The Towns also claim that in concluding that the impacts to Wetland E was negligible and therefore that no other practicable alternative having less environmental impact existed, the Corps reversed the rebuttable presumption contained in 40 C.F.R. 230.10(a). We disagree. None of the comments received by the Corps disputed that this 600 square feet area consisted of an isolated, man- made, low-value wetland. Neither Town asserted in the comments submitted to the Corps that Wetland E has any essential ecological value nor have they presented evidence to contradict the finding by the Corps that this small area of wetland has "virtually no function or value." Record of Decision at 7. In addition, we note that Wetland E does not meet the criteria for -16- regulation under the Massachusetts Wetland Protection Act. See ___ 310 Code of Massachusetts Regulations 10.57(1)(b). The Towns argue that once the Corps found that the direct impact of the landfill was "inconsequential," it was required to conduct an exhaustive feasibility evaluation of each of the 299 alternatives sites initially screened for the landfill. See Appellants' Brief at 21. We hold that such a ___ rigid interpretation of the guidelines is not warranted. The plain language of the Section 404 regulatory scheme indicates that the level of review depends on the nature and severity of the project's impact on the environment. The general introduction for Section 230.10 states: Although all requirements in 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities. 40 C.F.R. 230.10. In Section 230.6, the Guidelines further provide: (a) . . . These Guidelines allow evaluation and documentation for a variety of actives, ranging from those with large, complex impacts on the aquatic environment to those for which the impact is likely to be innocuous. It is unlikely that the Guidelines will apply in their entirety to any one activity, no matter how complex. It is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment. It generally is not intended or expected _________________________________________ that extensive testing, evaluation or _________________________________________ -17- analysis will be needed to make findings _________________________________________ of compliance in such routine cases. ___________________________________ (b) The Guidelines user, including the agency or agencies responsible for implementing the Guidelines, must recognize that different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of ____________ documentation should reflect the _________________________________________ significance and complexity of the _________________________________________ discharge activity. __________________ 40 C.F.R. 230.6(a) & (b) (1991) (emphasis added). Clearly, the guidelines contemplate an analysis which varies in magnitude depending on the impact of the proposed discharge, rather than the dogmatic scrutiny suggested by the Towns. In cases such as this one, where the MWRA and the EPA conducted a thorough environmental analysis of alternative sites, and where the Corps' determination that the direct impact on the aquatic ecosystem of filling the 600 square foot artificial wetland is negligible is supported by the administrative record, the Corps is not required under Section 230.10(a) to duplicate the analysis conducted by the MWRA and EPA. Norfolk & Walpole, __________________ 772 F. Supp. at 687. Nor can the Corps be faulted for relying on the alternative analysis conducted by EPA in its review of the landfill pursuant to the National Environmental Policy Act.22 In doing so, the Corps followed the recommendation of Section 230.10(a)(4), which provides that "the analysis of alternatives required for NEPA environmental documents . . . will in most ____________________ 22 42 U.S.C. 4321 et seq. __ ___ -18- cases provide the information for the evaluation of alternatives under [the Section 404] Guidelines." Although Section 230.10(a) recognizes that the NEPA review may provide insufficient analysis to meet the Section 404 guidelines requirements, it is apparent here that the Corps supplemented the extensive alternatives analysis conducted by the MWRA and the EPA. The Corps re- evaluated several potential sites to verify that the environmental criteria used in the selection of the proposed landfill was properly applied. The Corps found that many of these sites didn't meet the landfill acreage requirements and therefore were appropriately not considered for landfills. Other sites which were considered for landfills were ranked lower than Walpole-MCI and therefore deemed less preferable and not carried forward. ROD at 11. The Corps reasonably relied on the substantial evaluation conducted by the MWRA and EPA to find that the landfill in Walpole was the best alternative under the Guidelines. The initial screening for a landfill began with approximately 300 potential sites and after substantial additional evaluation of about ten individual sites, Walpole was selected. Under the practicable alternatives test, the Corps is not required to conduct an independent feasibility evaluation of each alternative site merely because a party disagrees with its ultimate conclusion. We hold that it was not arbitrary, capricious or contrary to law for the Corps to conclude that no practicable alternative to this 600 square feet of artificial wetland exists which would have a lesser "adverse impact on the -19- aquatic ecosystem." 40 C.F.R. 230.10(a)(3). If the Corps' determination under Section 404 is reasonably supported by the administrative record, our inquiry must end. Friends of Earth, ________________ 800 F.2d at 835. -20- B. Has the Corps Failed to Consider the Secondary Impacts on the _____________________________________________________________ Wetlands of the Proposed Discharge on Aquatic Ecosystem? _______________________________________________________ The Corps analyzed two potential secondary impacts on the adjacent wetlands; (1) the possibility that leachate might reach the surface waters in the event of a leak from the landfill and (2) the loss of surface/groundwater recharge. The Corps concluded that although the potential for leachate transmission into the adjacent wetlands existed, its likelihood will be greatly minimized by the state-of-art landfill design and collection system which will be used. Even if some leakage occurred, the propensity of wetlands to assimilate the leachate constituents (i.e. act as a sink) is well recognized. In fact the use of wetlands as tertiary treatment is well documented and recognized by EPA. Therefore, the effect is expected to be minor. ROD at 12. The Corps also characterized the possible loss of surface water and groundwater recharge as a minor impact since "the proportion of precipitation falling on the landfill site which infiltrates into the groundwater is small (about 1/5 [of an acre]) . . . when compared to the proportion entering the adjacent wetlands as surface runoff" and the landfill represented a very small portion of the total drainage area supporting the off-site wetlands. Id. The district court found that the Corps' __ conclusions regarding the secondary effects of the landfill to be reasonable. Norfolk & Walpole, 772 F. Supp. at 688. _________________ The Towns, however, claim that the Corps failed to adequately consider secondary wetland impacts as part of the -21- practicable alternatives analysis. The Towns' argument run as follows. First, the Corps attempts to avoid the practicable alternatives analysis by concluding that certain mitigation measures planned by the MWRA would render any secondary impacts to wetlands inconsequential. Second, the Corps' conclusion that Wetland E is a minor part of the total drainage areas supporting the Stop River wetlands cannot serve as a justification for the issuance of the permit, and in any event, the Towns argue that they have presented evidence to contradict this finding. Citing Bersani v. Robichaud, 850 F.2d 36, 39 (2d Cir. _______ _________ 1988), cert. denied, 489 U.S. 1089 (1989), the Towns allege that ____ ______ mitigation measures may not be used to meet the practicable alternative analysis. The Towns's interpretation of Bersani is _______ not persuasive. In Bersani, the EPA denied an application for a _______ permit to build a shopping mall on 32 acres of "high quality red maple swamp." Id. at 40. To compensate for filling 32 acres of __ this "high quality" wetland, the developer proposed to create 36 acres of wetland in an off-site gravel pit. The EPA determined that this mitigation measure was insufficient because (1) of its scientific uncertainty; (2) the availability of an alternative site for the shopping mall; and (3) the adverse effect on wildlife. Bersani, therefore, does not announce a procedural _______ straitjacket against the use of mitigation measures to compensate for environmental losses, but rather it upholds the basic proposition that if mitigation measures are insufficient to compensate for the loss of a valuable wetland, the permit should -22- be denied. See also Friends of Earth v. Hintz, 800 F.2d 822, 826 ________ ________________ _____ (9th Cir. 1986) (affirming Corps' conditional issuance of a Section 404 permit on compliance with an agreement proposing mitigation measures). Moreover, in this case there will be no destruction of a "high quality" wetland area; rather the direct impact on the aquatic environment involves the filling of 600 square feet of an isolated, artificial wetland that was used by the Department of Corrections as an obstacle course for training prison guards. We hold that it is reasonable for the Corps to consider, under the practicable alternatives analysis, the functional value of the wetland to be impacted and the mitigation measures proposed to avoid secondary impacts. The Towns cite Buttrey v. United States, 690 F.2d 1170 _______ _____________ (5th Cir. 1982), cert. denied, 461 U.S. 927 (1983) for the ____ ______ proposition that the Corps cannot rely on its conclusion that Wetland E is a minor part of the total drainage area supporting the Stop River wetlands. In Buttrey, a land developer argued _______ that his project proposal to fill about 40 acres of wetland was a "mere flyspeck" in relation to the river watershed adjacent to the property. The Fifth Circuit noted that such "piecemeal" review of the proposed project is prohibited by 33 C.F.R. 320.4(b)(3), which provides: Although a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an -23- application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area. Simply stated, 33 C.F.R. 320.4(b)(3) -- which authorizes the Corps to consider the cumulative effect of numerous piecemeal changes in its "public interest review" analysis -- does not apply here. The 600 square foot artificial wetland to be filled is not "part of a complete and interrelated wetland area"; it is isolated. And none of the comments in this case contradicted the Corps' finding that Wetland E had virtually no value. In Buttrey, it was undisputed that since the forty acre wetland was _______ located upstream, it served a unique function in maintaining downstream water quality. The secondary impacts here result not from filling Wetland E but from the setting aside of 46 acres, most of which is on upland. Finally, the proposed project in Buttrey was opposed by the Fish and Wildlife Service, EPA and the _______ National Marine Fisheries Service because they alleged it would inter alia destroy a habitat and nursery ground for wildlife and _____ ____ increase the risk of flooding in surrounding neighborhoods. No such opposition was registered by these government agencies against this project. In their comments, the Towns' consultants claim that the construction of the landfill would potentially eliminate up to fifty percent of the drainage areas to adjacent wetlands, including Wetland A, a site which has a vernal pool, approximately 150 feet from the footprint of the proposed landfill. The Corps, however, concluded that the landfill site -24- represents less than one percent of the total drainage area and that the mitigation measures would render any impacts insignificant. With respect to the mitigation measures, the Corps specifically found: The [MWRA] has committed to develop a plan to capture the rainfall and return it to the wetlands directly adjacent to the landfill to protect their hydrology. This leads to the conclusion [that] the potential for adverse affect on the hydrology of the adjacent wetlands is minor. In any event, the development of the landfill will include elaborate monitoring of baseline conditions of the adjacent wetlands, modelling of the water flows, and a collection and replacement system to return the water to the wetlands. A portion, based on the modelling, will be returned as surface water, and a portion will be returned as ground water via an infiltration system. ROD at 12. The Corps further noted that the MWRA has implemented these mitigation measures in other projects and that the Corps had "approval authority over the monitoring and mitigation program through a special condition of the permit . . . ." Id. __ The Towns' objection to the Corps findings on the subject of drainage reflect nothing more than a disagreement between the experts. In cases where technical disputes predominate the issues, an agency's expertise is entitled to deference. Chevron _______ U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, ______ ________________________________________ 844 (1984). We hold that the Corps' conclusions that the landfill site represents less than one percent of the total drainage area and that the mitigation measures would render any potential impact insignificant are not clearly arbitrary, -25- capricious or otherwise not in accordance to law. -26- C. Are Groundwater Resources Part of the Aquatic Ecosystem for ___________________________________________________________ Purposes of the Practicable Alternatives Analysis? _________________________________________________ In applying the practicable alternatives analysis, the Corps excluded groundwater resources from consideration. The Towns allege that groundwater resources are part of the "aquatic ecosystem" for purposes of the practicable alternatives analysis. The district court held that: The plain language of the Guidelines clearly constrains the alternative analysis, in the first instance, to effects on the aquatic ecosystem. "Aquatic ecosystem," in turn, is defined as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. 230.3(c). The Corps' determination that groundwater sources are not aquatic ecosystems was clearly a reasonable interpretation of 230.10(a), as [groundwater sources] cannot be said to "serve as habitat for interrelated and interacting communities and populations of plants and animals." While the impact on groundwater is certainly an "environmental consequence," the alternatives analysis is limited to comparison of effects on the aquatic ecosystem. Norfolk & Walpole, 772 F. Supp. at 685. The Towns, however, __________________ argue that groundwater resources are "waters of the United States." 40 C.F.R. 230.3(s)(3) provides that the term "waters of the United States" includes: All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sand- flats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or -27- destruction of which could affect interstate or foreign commerce including any such waters: (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes . . . . Although this definition does not indicate whether groundwater constitutes "waters of the United States," the Corps has interpreted this definition to refer only to surface waters. This interpretation has been upheld by some courts. Exxon Corp. ___________ v. Train, 554 F.2d 1310, 1329 (5th Cir. 1977); Kelley v. United _____ ______ ______ States, 618 F. Supp. 1103, 1105 (W.D. Mich. 1985; United States ______ _____________ v. GAF Corp., 389 F. Supp. 1379, 1383 (S.D. Tex. 1975). Although _________ other courts have questioned whether the term "waters of the United States" should include groundwaters connected to surface waters -- Inland Steel Co. v. E.P.A., 901 F.2d 1419, 1422 (7th _________________ ______ Cir. 1990); McClellan Ecological Seepage v. Weinberger, 707 F. _____________________________ __________ Supp. 1182, 1193-94 (E.D. Cal. 1988) -- we agree with the Corps that since such a determination ultimately involves an ecological judgment about the relationship between surface waters and groundwaters, it should be left in the first instance to the discretion of the EPA and the Corps. Cf. United States v. __ ______________ Riverside Bayview Homes, Inc., 474 U.S. 121, 134 (1985) _________________________________ (deference should be given to "the Corps' ecological judgment about the relationship between waters and their adjacent wetlands"). We have carefully examined the Towns' other arguments and conclude that they have no merit. -28- D. Do Other Practicable Alternatives Exist Which Would Have Less _____________________________________________________________ Adverse Effects On The Aquatic Ecosystem? ________________________________________ If the Corps had properly conducted the practicable alternatives analysis -- the Towns claim -- it would have been unable to overcome the presumption in Section 230.10(a) because other alternatives which would have less "severe environmental impacts" than Walpole are available. The Towns point out that (1) the MWRA itself determined that another alternative -- Rowe Quarry -- would have a less severe environmental impact than the Walpole site and (2) the Governor of Massachusetts appointed a Commission in February of 1991 which identified six other alternatives. In a draft report dated October 1988, the MWRA concluded that "development of the Rowe Quarry as a landfill would result in minimal environmental impacts in comparison to those that would occur at the Walpole-MCI site."23 On its face this statement appears to raise an issue of fact as to whether the decision of the Corps was arbitrary. Nevertheless, the issue under the practicable alternatives analysis of Section 230.10(a) is whether the alternative site would have less adverse impact on the aquatic ecosystem than the Walpole site. A finding that a ___ _______ _________ potential site such as Rowe Quarry may have less adverse environmental effects does not constitute a finding that such site would have less adverse effects on the aquatic ecosystem. In fact, EPA concluded that the documents used in the NEPA ____________________ 23 Draft Report on Minor Residuals Landfilling at 56. -29- review, "establish[] that the insignificant potential adverse impacts on the aquatic ecosystem at the Walpole site are no greater than those which could potentially result from a landfill at Rowe Quarry."24 For example, EPA noted that a landfill at Rowe Quarry "could potentially cause adverse impacts to the Saugus River and Rumney Marsh wetland system, a state designated Area of Critical Environmental Concern."25 The Towns argue that an investigation by the Harbor Residuals Landfill Siting Advisory Commission identified six potential alternatives to the Walpole site, "all of which are superior under the 230.10(a) standard." Brief of Appellants at 30. The district court concluded that "[t]he Corps cannot be faulted for not considering the report of the Governor's Commission, however, as the Commission was not even in existence until after the [Record of Decision] and the permit were issued."26 The district court's conclusion finds support in the introduction of the Commission's report, where the first point made is that the Commission's task has been to evaluate alternatives that currently offer themselves as options to the development and use of the Walpole site, not to assess the wisdom of the past selection of that site. Our review of current alternatives can take account of ____________________ 24 Letter dated November 2, 1990 from the Director of EPA's Water Management Division to Lt. Colonel Stanley J. Murphy, District Engineer, U.S. Army Corps of Engineers. 25 Id. at 6. __ 26 Norfolk & Walpole, 772 F. Supp. at 688. _________________ -30- circumstances that were unknown or unsettled when the MWRA conducted its site selection process and federal and state regulators carried out their environmental reviews from 1986 to 1990. More significantly, the Commission itself recognized that the actual feasibility of the six potential alternative sites it had identified was an open question.27 Finally, the Commission's report contains no discussion of adverse impacts on the aquatic ecosystem. With respect to general environmental considerations, the Commission's report provides a limited analysis.28 In sum, the Commission's report is insufficient to raise a genuine issue of material fact that the Corps' determination that the Walpole site meets the practicable alternative analysis was arbitrary, capricious or contrary to law. III Section 230.10(b) Section 230.10(b) _________________ Section 230.10(b) provides in pertinent part: No discharge of dredged or fill material shall be permitted if it: * * * (3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species ____________________ 27 Id. at 2 ("[O]ur identification of several, possibly feasible __ alternatives to the Walpole site does not mean that all uncertainties surrounding the feasibility of those alternatives have been eliminated"). 28 Id. at 20. ("Certainties about environmental acceptability __ will only become available, however, after further planning and permitting activities with respect to any of the alternatives"). -31- Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act, as amended. The Towns assert that the Corps failed to give adequate consideration under Section 230.10(b) to impacts on the habitats of pied-billed grebes and great blue herons that are located on the Stop River Impoundment, which borders the landfill site to the west.29 In the Record of Decision, the Corps recognized that [t]he increased noise and activity during construction and operation of the landfill may adversely impact one of the state's largest Great Blue Heron rookeries and several pied-billed grebes, a state threatened bird in the Stop River impoundment a quarter of a mile away. ROD at 7. The Towns argue that the Corps violated Section 230.10(b) because it failed to conduct an extensive review of these impacts to wildlife. We disagree. As the district court recognized, Section 230.10(b) does not apply here because neither the pied-billed grebe nor the great blue heron are "species listed as endangered or threatened under the Endangered Species Act of 1973." 40 C.F.R. 230.10(b). Furthermore, the National Marine Fisheries Department and the U.S. Fish and Wildlife Service -- the federal agencies empowered to protect wildlife resources -- have indicated no objection to the landfill at Walpole. ____________________ 29 Massachusetts has listed the pied-billed grebe as endangered and threatened under state law. Mass. Gen. Laws ch. 131, 4, clause 13A; Mass. Regs. Code tit. 321, 8.01(3)(b). -32- Notwithstanding the clear language of Section 230.10(b), the Towns assert that Section 230.30(a) requires that the impact of the landfill on the pied-billed grebe be analyzed under Section 230.10(b). Section 230.30(a) states that "[l]istings of threatened and endangered species as well as critical habitats are maintained by some individual States and by the U.S. Fish and Wildlife Service of the Department of the Interior." The district court concluded that consideration of impacts on wildlife, including species listed as endangered under state law, is properly reviewed under Section 230.10(c), which provides in pertinent part: Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations and tests required by Subparts B and G, after _____ consideration of Subparts C through F, ________________________________________ with special emphasis on the persistence and permanence of the effects outlined in those subparts. 40 C.F.R. 230.10(c) (emphasis added). As the underlined part indicates, Section 230.10(c), unlike Section 230.10(b), specifically refers to Subpart D of the Section 404 Guidelines, which includes Section 230.30(a). Furthermore, the evidence indicates that the landfill would not threaten the continued existence of the grebe. The Stop River Impoundment is located approximately 2,000 feet from the boundary of the landfill footprint and, according to the -33- Towns' consultant, only one pair of grebes has been sighted in this area. The projected noise level of the construction and operation of the landfill is expected to be 45 decibels. In its Supplemental Environmental Impact Statement, EPA reasonably concluded that this noise impact would not threaten the existence of the grebe. -34- Noise levels exceeding 60 dBA [decibels] are considered loud to wildlife, and levels exceeding 75 dBA may cause damaging effects (Santa Barbara County, 1984). Since noise levels are projected to be about 45 [decibels] at the edge of the Stop River impoundment (2,000 feet from the noise source), significant noise impacts would not occur to wildlife (including the heron rookery) using the impoundment. DSEIS at 5-93. Regarding noise levels that could potentially impact waterfowl and other wildlife using adjacent wetlands, EPA explained: Resident wildlife species at the site currently use the nearby impoundment, wetlands, and forested areas in spite of the activities of two local prisons and an adjacent firing range. These activities have resulted in ambient noises levels up to 49 dBA at the closest sample point to the reservoir (MWRA, RMFP, Screen, I, 1988). Animals using the site have likely become accustomed to such daily noise levels given the extended exposure. Any noise-related impacts that occur at the heron rookery (a resource of special concern) could be mitigated by limiting construction activity to nonbreeding periods such as fall and winter. Id. Finally, the district court made two findings to support its __ determination that the Corps' conclusion that impacts on wildlife were insignificant "was not unreasonable." Norfolk & Walpole, __________________ 772 F. Supp. at 690. First, the Towns' own exhibit states that although herons "tend to prefer more remote, serene habitats," they "are generally tolerant of noise and other human disturbances," [Exh. "E" at 7], and that "the Heron is generally more sensitive to noise and other disturbances than the Grebe or Wood Duck," id. at 8. __ -35- Id. at 19. Second, the district court found that the Corps had __ specifically considered negative effects of the landfill on the grebe and the blue heron in its public interest analysis. Given these findings, we cannot say the permit decision was arbitrary. IV Section 230.10(c) Section 230.10(c) _________________ Under 40 C.F.R. 230.10(c), the Corps must reject a permit application which proposes a discharge "which will cause or contribute to significant degradation of the waters of the United States."30 The Corps did not specifically consider the impact on groundwaters as required pursuant to Section 230.10(c) because it erroneously claimed that groundwaters effects on "municipal water supplies" were not part of the "significant degradation" test.31 The district court concluded that although the Corps had not properly conducted the Section 230.10(c) analysis, the Corps' findings under its public interest review analysis indicated that the Corps had properly evaluated groundwater ____________________ 30 As discussed ante, at 24-25, groundwater effects were not ____ considered under Section 230.10(a) because that section calls for a determination of the "adverse impact on the aquatic ecosystem." Aquatic ecosystem is defined as a water of the United States "that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. 230.3(c). It is clear that groundwater resources do not "serve as habitat for interrelated and interacting communities and populations of plants and animals." See Norfolk & Walpole, 772 ___ __________________ F. Supp. at 685. 31 The Corps did conclude in its "Short Form, Section 404(b)(1) Guidelines Compliance Determination" that the landfill will not cause significant adverse effects on municipal water supplies. Norfolk & Walpole, 772 F. Supp. at 690. _________________ -36- impacts. The district court explained: The [Record of Decision] discusses at great length -- no subject is given more careful attention -- the possible effects of leaks in the landfill on nearby drinking water supplies, including ten private wells near the site, larger wells 3,500 feet away that supply drinking water to the adjacent prisons, a well supplying a hospital in the vicinity, and the Head of Neponset Sole-Source Aquifer. The [Record of Decision] indicates that the Corps evaluated the tests performed by the EPA and the MWRA for the EIS and, where necessary, conducted its own tests. Norfolk & Walpole, 772 F. Supp. at 690. The district court noted _________________ that the Corps addressed each of the Towns' objections to the Corps' groundwater analysis. Id. __ The Towns do not argue that the Corps' findings or conclusions regarding potential impacts to groundwater resources are arbitrary, capricious or otherwise not in accordance with law. Instead, the Towns argue that the Corps' failure to analyze impacts to groundwaters under Section 230.10(c) constitutes reversible error. We think this argument elevates form over substance. Under 40 C.F.R. 230.10(c), "[f]indings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by Subpart B and G, after consideration of Subparts C through F, . . ." The Corps' public interest review analysis demonstrates that although the exact wording of Section 230.10(c) was neglected, the intent and purpose of that section was satisfied. The Corps provided a lengthy and detailed evaluation -37- of the potential impacts of the landfill on groundwater supplies. The Corps' Hydraulics and Water Quality Branch performed an independent analysis of the potential impact on groundwater supplies and concluded that "the risk to drinking water supplies from the landfill is minor." In sum, the Towns' challenge under Section 230.10(c) fails. V Public Interest Review Public Interest Review ______________________ Under 33 C.F.R. 320.4(a), the Corps is required to evaluate a permit for "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." The Towns assert that the Corps' public interest review was inadequate because the Corps should have weighed the impact of the Walpole landfill against the ultimate need to clean-up Boston Harbor. According to the Towns, the Corps should weigh the adverse impacts of the Walpole landfill against other sites potentially available. But this narrow interpretation of the public interest review is illogical since it asks the Corps to duplicate the "practicable alternatives" analysis of 40 C.F.R. 230.10(a). The Corps' conclusion that the MWRA's proposed project is not contrary to the public interest is reasonably supported in the administrative record. Under the "public interest" review, the Corps conducts a general balancing of a number of economic and environmental factors and its ultimate determinations are entitled to substantial deference. Environmental Coalition of ___________________________ -38- Broward County, Inc. v. Myers, 831 F.2d 984, 986 (11th Cir. ______________________ _____ 1987). We must not lose sight of the fact that the 600 square feet to be filled has no ecological value and is isolated. Furthermore, the Corps conditioned the MWRA's application "to require maintenance of existing ground and surface water hydrologic regime which supports the adjacent wetlands." Finally, as the district court noted: Considering the necessity of the landfill in the overall clean-up project, the MWRA's history of difficulty in acquiring any site, . . . as compared with what the ___ Corps determined to be insignificant effects on wetlands, the Corps' conclusion that the project is not contrary to the public interest was justified. Norfolk & Walpole, 772 F. Supp. at 692. _________________ VI Communications between the Department of Justice, Communications between the Department of Justice, _________________________________________________ EPA and the Corps EPA and the Corps _________________ Between late December 1990 and early 1991, while the MWRA's application for the Section 404 permit was pending, there were a number of communications among officials of the Corps and attorneys of the Department of Justice and officials of the EPA. Based upon a request pursuant to the Freedom of Information Act ("FOIA"),32 the Towns reviewed some internal Corps documents which expressed opposition to the issuance of the permit and ____________________ 32 5 U.S.C. 552. The Freedom of Information Act creates a presumption that an agency must disclose all written information in an agency's possession, unless exempted under one of the exceptions of the Act. -39- which noted that these communications had occurred. The Towns therefore notified the keeper of the records of the United States Attorney for the District of Massachusetts to appear for a deposition and subpoenaed all documents concerning pre-permit communications between the EPA, the Department of Justice and the Corps ("defendants"). Asserting inter alia the attorney client _____ ____ and work product privileges, the defendants moved to obtain a protective order and quash the subpoenas. The Towns maintain that these documents should originally have been included in the administrative record because they may show that the Department of Justice and EPA improperly pressured the Corps to issue the permit sought by MWRA. On May 13, 1991, the district court issued an order directing the defendants to submit the documents to the court for in camera inspection. The U.S. Attorney submitted 38 documents __ ______ and the EPA submitted 19 documents. Assistant U.S. Attorney Henderson divided the documents into four categories. Category I consists of letters from the U.S. Attorney's Office to the Corps of Engineers. Category II consists of notes of communications between Department of Justice Attorneys or Assistant U.S. Attorney Henderson and Corps of Engineers officials, most of whom are in house counsel for the Corps. Category III consists of internal communications among the Department of Justice attorneys and the U.S. Attorney's Office. Category IV consist of a draft of an unsigned letter from the Corps to the MWRA dated January 4, 1991. -40- EPA's counsel Jeffrey T. Fowley similarly divided the documents submitted by the EPA for in camera review into three __ ______ categories. Category I consists of communications between EPA attorneys and Corps of Engineers personnel. Category II consists of communications between EPA technical personnel and Corps of Engineers personnel. Category III consists of documents created by EPA's consultant, Metcalf & Eddy, Inc. Although the Towns challenge the exclusion of all these documents, they first challenge the exclusion of the documents contained in Category II and III of the U.S. Attorney's submission and all of the documents submitted by the EPA. After finding that the Corps personnel had only seen seven of the 57 documents, the district court concluded that the remaining 50 documents did not belong in the administrative record because they were never considered by Corps personnel. With respect to the seven documents at issue, the district court concluded that all but two were not properly made part of the administrative record and the other two were shielded from discovery by the attorney-client privilege. Town of Norfolk & __________________ Walpole v. U.S. Army Corps of Engineers, 137 F.R.D. 183, 190 _______ ______________________________ (D. Mass. 1991). In an exhaustive opinion, the district court noted that courts may look beyond the administrative record when there is "a strong showing of bad faith or improper behavior before such inquiry may be made." Citizens to Preserve Overton Park, Inc. v. _______________________________________ Volpe, 401 U.S. 402, 420 (1971). The district court judge _____ -41- concluded on the basis of his in camera review that the documents __ ______ did not provide a showing of bad faith. Town of Norfolk & __________________ Walpole, 137 F.R.D. at 189. _______ The Towns argue that the district court applied the wrong standard (1) in excluding the fifty documents that the Corps never considered; (2) in excluding letters by the U.S. Attorney's Office to the Corps; (3) in excluding from the administrative record two letters which comment on the merits of the petition; and (4) in excluding a draft letter prepared by the Corps pursuant to the deliberative privilege. Alternatively, the Towns claim that even if these documents were properly excluded, the district court erred in not permitting supplementation of the administrative record. For the reasons that follow, we hold that district court did not abuse its discretion in granting the protective order and the motion to quash the subpoenas. A. Did the District Court Err in Excluding Documents Never Seen _____________________________________________________________ by the Corps? __ _________ The Towns argue that the test of whether information is part of an administrative record is whether the information was directly or indirectly considered by the permitting agency. They argue that in concluding that all but seven of the fifty seven documents did not belong in the administrative record because these documents were never seen by the Corps, the district court erred because it created a rule that allows administrative agencies to avoid "judicial review of their actions by relying on oral communications." Brief of Appellants at 43. -42- The Towns seem to be asserting that every document which reflects an oral communication with a government agency must be included in the administrative record, even if these documents are not in the possession of the agency. The fallacy of this argument is obvious. Were we to accept it, government agencies would be required to collect from all parties who had oral communications with the agency concerning the issue under consideration, all documents reflecting these communications with the agency and include them in the record. There is no support in administrative law for such a requirement and its legality is highly questionable. We have carefully reviewed the remaining fifty documents and conclude that these documents contain no factual or policy information relevant to the issuance of the permit. Indeed, National Wildlife Federation v. Burford, 677 F. Supp. _____________________________ _______ 1445, 1457 (D. Mont. 1985) -- cited by the Towns in support of this argument -- supports the district court's decision to exclude the documents. In National Wildlife, the court concluded _________________ that the contents of the personal files and notes of employees of the Department of the Interior were properly not made part of the administrative record. Id. at 1457. Similarly, most of the __ submissions by EPA and the Justice Department consists of notes of the personnel of these agencies which reflect telephone conversations of no significance. The remaining documents -- with a few exceptions discussed below -- consist of notes made by various government attorneys during telephone conversations and -43- they reflect the mental impressions and opinions of these attorneys. We therefore hold that the district court did not abuse its discretion in excluding these documents. We now review the district court's conclusion that the seven documents seen by the Corps' personnel did not belong in the administrative record. -44- B. Did the District Court Err in Excluding Seven Documents Seen _____________________________________________________________ by the Corps But Not Included in the Administrative Record? __ _______________________________________________________ The district court concluded that seven of the documents were seen by the Corps and warranted separate consideration. Six of the documents are letters from the U.S. Attorney's Office to the Corps of Engineers and the seventh document is an unsigned draft of a letter from Colonel Phillip R. Harris, District Engineer for the New England Division, to Richard D. Fox of the MWRA. The district court concluded that the six letters did not belong in the administrative record because they did not contain factual statements or made policy recommendations and because only two of these letters commented on the merits of the petition. These two letters were written by Assistant U.S. Attorney Henderson and sent to Gary Pasternak, Assistant District Counsel for the Corps, and to Colonel Harris, the District Engineer. In both letters, Assistant U.S. Attorney Henderson expressed his opinion that David Killoy's memorandum of December 24, 1990, could be withheld from public disclosure under the deliberative process privilege of the FOIA. Assistant U.S. Attorney Henderson expressed his view that the Killoy memorandum was a deliberative document and that its analysis was "faulty." The district concluded that it was "highly unlikely that the Corps of Engineers would have relied on this statement in deciding the permit question," since the letter provided "no legal, factual, or policy reason for this conclusory statement, -45- and the statement was made only to support the U.S. Attorney's position that the memoranda were 'deliberative.'" Alternatively, the district court held that these letters were protected from disclosure under the attorney-client privilege. The district court's action is fully supportable. A person asserting the attorney-client privilege with respect to a document provided by an attorney has the burden of showing four elements: (1) that he was or sought to be a client of [the attorney]; (2) that [the attorney] in connection with the [document] acted as a lawyer; (3) that the [document] relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding; and (4) that the privilege has not been waived. United States v. Bay State Ambulance and Hosp. Rental Service, ______________ _______________________________________________ Inc., 874 F.2d 20, 27-28 (1st Cir. 1989) (citing United States v. ____ _____________ Wilson, 798 F.2d 509, 512 (1st Cir. 1986)). ______ At the time these six letters were written -- from January to February of 1991 -- the Towns had brought several suits to attempt to overturn the decision to place the landfill in Walpole. The Towns had (1) filed suit in state court challenging the state environmental review process; (2) filed a motion to intervene in a suit filed by the United States seeking an order from the district court to transfer the Walpole site from the Department of Corrections to the MWRA; and (3) filed suit in the district court challenging EPA's review of the landfill selection -46- under the National Environmental Policy Act.33 Clearly, the Towns had made every effort to overturn the decision to locate the landfill in Walpole and it was reasonable for the Corps and the U.S. Attorney to anticipate litigation over the Corps permit decision. As the district court found: An attorney-client relationship exists between the Corps of Engineers and the U.S. Attorney in connection with anticipated litigation. See 28 U.S.C. ___ 516-519 (plenary authority of Attorney General and Department of Justice to conduct and direct litigation involving the United States or its agencies); see ___ also 5 U.S.C. 3106 (heads of executive ____ and military departments to refer litigation to Justice Department). The [six] letters reveal that the U.S. Attorney was acting as a lawyer and was engaged in giving the Corps legal advice with respect to reasonably anticipated litigation (that is, the instant case). All the letters begin with the heading, "ATTORNEY-CLIENT COMMUNICATION, PRIVILEGED AND CONFIDENTIAL," and there is no indication that these communications were disclosed to third parties. Id. at 190. __ The Corps has met each of the elements required to assert the attorney-client privilege. The Corps was a client of the U.S. Attorney. The letters were from the U.S. Attorney to its client and by the content of the letters, it is clear that they "relate to facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding." Bay State Ambulance and Hosp. Rental Serv., 874 _____________________________________________ ____________________ 33 42 U.S.C. 4321 et seq. __ ___ -47- F.2d at 28. Finally, the Corps has not waived the privilege. Although there may be an unusual and extraordinary circumstance where a document protected by the attorney-client privilege should be made part of the administrative record, this is clearly not the case. B. Did the District Court Err in Excluding as Deliberative a ____________________________________________________________ Draft Letter Prepared by the Corps? _____ ____________________________ The district court concluded that an unsigned draft of a letter from Colonel Phillip R. Harris, District Engineer for the New England Division to Richard D. Fox of the MWRA was protected by the deliberative process privilege. The deliberative process privilege protects the internal deliberations of an agency in order to prevent "injury to the quality of agency decisions." NLRB v. Sears, Roebuck & ____ ________________ Co., 421 U.S. 132, 151 (1975). Two requirements must be met ___ before the government may properly withhold a document from disclosure. Nadler v. U.S. Dept. of Justice, 955 F.2d 1479, ______ _______________________ 1490-91 (11th Cir. 1992). First, the document must be prepared prior to a final decision "in order to assist an agency decisionmaker in arriving at his decision." Id. at 1491 (citing __ Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, _________________ ____________________________ 184 (1975)). Second, the document must be "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." Id. (citing __ Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)). ______ _____ Furthermore, factual information that may be segregated from the -48- rest of the document is not protected by the privilege. 5 U.S.C. 552(b); Nadler, 955 F.2d at 1491; Hopkins v. U.S. Dept. of ______ _______ ______________ Housing & Urban Dev., 929 F.2d 81, 85 (2d Cir. 1991). ____________________ The document at issue here is an unsigned draft letter from Colonel Harris, dated January 4, 1991, to Richard Fox of the MWRA informing the MWRA that the Corps would not be able to issue a permit for the Walpole landfill "by the end of January deadline" and setting forth two options to "stay on the court mandated schedule" for the Boston Harbor cleanup project. The draft letter has no factual information and it reflects a preliminary position by the Corps that was subsequently rejected. Accordingly, the draft letter is clearly protected from disclosure by the deliberate process privilege. C. Did the District Court Err in Not Permitting Supplementation ____________________________________________________________ of the Record? __ __________ The Towns seek to include the 57 documents in the administrative record based on the assertion that the Department of Justice and the EPA secretly and improperly "pressured" the Corps to issue the permit. The district court examined the documents in camera and concluded the they did not demonstrate __ ______ bad faith or improper behavior to warrant ordering the supplementation of the administrative record. The basis for our review of the permit decision here is the administrative record. Florida Power & Light Co. v. ____________________________ Lorion, 470 U.S. 729, 743-44 (1985); Camp v. Pitts, 411 U.S. 138, ______ ____ _____ 142 (1973); Friends of the Earth, 800 F.2d at 829. Courts ______________________ -49- require a strong showing of bad faith or improper behavior before ordering the supplementation of the administrative record. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 _________________________________________ _____ (1971); Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir. _______________ _________ 1991). Citing D.C. Fed'n of Civic Ass'ns v. Volpe, 459 F.2d ____________________________ _____ 1231, 1249 (D.C. Cir.), cert. denied, 405 U.S. 1030 (1972), the ____ ______ Towns asserts that the district court erred in concluding that there was no improper behavior here, particularly given the ex __ parte high level discussions among executive branch officials. _____ We think that the Towns' exaggerate the reach of Volpe. _____ Volpe does not dilute the requirement of making a _____ strong showing of bad faith or improper behavior before supplementing the record. In Volpe, a divided panel of the _____ District of Columbia Circuit held that the Secretary of Transportation had failed to comply with the statutory requirements and other provisions applicable to federal funded highway projects in approving construction of a bridge across the Potomac. The defects in the Secretary's decision in Volpe were _____ colossal, including his failure to compile an administrative record or to make formal findings and his approval of the bridge project prior to the finalization of the plans for the bridge.34 The evidence in Volpe also showed that the Chairman _____ ____________________ 34 These facts are in sharp contrasts with the MWRA's application, which among other measures, spent more than $10 million on the site selection process and obtained the necessary environmental approvals from state and federal authorities. See ___ United States v. Metropolitan Dist. Com'n, 930 F.2d 132, 134 (1st _____________ ________________________ -50- of the Subcommittee on the District of Columbia of the House Appropriations Committee publicly pressured the Secretary by threatening to withhold funds for the District's rapid transit system unless the bridge project was approved. Two judges held that the Secretary of Transportation's decision would be invalid if based in whole or in part on "political pressure." Id. at __ 1246.35 Our review of the in camera submission supports the __ ______ district court's conclusion that there is no evidence here to suggest that "political pressure" or any kind of unseemly influence, in whole or in part, affected the Corps' permitting process. In this case, the Corps has presented a detailed Record of Decision and it is reasonably supported by the administrative record. It shows that the Corps based its decision on the factors relevant to determining whether the MWRA's permit application complied with the Section 404 Guidelines and whether issuance of the permit would be in the public interest. The Towns claim inter alia that "Volpe stands for the _____ ____ _____ proposition that if other litigation [involving the United States] or the Boston Harbor clean-up project" were considered by the Corps in issuing the permit, the decision must be vacated and ____________________ Cir. 1991). 35 A different majority of two judges, however, concluded that the district court had not found that "political pressure" had influenced the Secretary's decision. Significantly, only one judge in the panel found that the district court had held that "extraneous pressure" had coerced the Secretary to approve the bridge project. Id. at 1246. __ -51- remanded. Although this interpretation of Volpe seems _____ questionable, we need not conclusively determine its soundness since none of the documents submitted for in camera review show __ ______ any indication of impropriety by the United States or that the position of the United States in other litigation was considered by the Corps in its permitting process. The Towns have not presented any evidence that the fact that the U.S. Attorney's Office represented the Corps and the EPA was a factor considered in the permitting process. The Justice Department has the sole responsibility for representing executive branch agencies in litigation. The Supreme Court has recognized that the main purposes of centralizing litigation responsibility in the Justice Department is to assure that the United States should speak with one voice "that reflects not the parochial interests of a particular agency, but the common interests of the Government and therefore of all the people." United States v. Providence ______________ __________ Journal Co., 485 U.S. 693, 706 (1988). ___________ Finally, we have examined the in camera submission and __ ______ conclude that adding these submissions to the record would serve no purpose. The Killoy memoranda explained in sufficient details the internal Corps opposition to the issuance of the permit. The Towns have not cited precedent -- nor have we found any -- indicating that a district court should allow supplementation of an administrative record with information which is already properly documented in the administrative record. D. Whether the District Court Judge Erred in Denying the Towns' ____________________________________________________________ -52- Motion for His Disqualification? _______________________________ During the proceedings below, the Towns moved pursuant to 28 U.S.C. 455(a) to excuse Judge Mazzone. Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Judge Mazzone denied the Towns' motion for his disqualification finding no basis for it since "[t]he record in this case is lengthy, and, as both sides point out, there are occasions when my rulings and orders, or remarks from the bench in connection with a ruling, have evoked disappointment from the litigants." Memorandum Order ________________ of May 21, 1991. The issue of disqualification in this Circuit turns on whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. 455, but rather in the mind of a reasonable man. United States v. Arache, 946 F.2d 129, 140 (1st Cir. 1991) ______________ ______ (citing United States v. Cowden, 545 F.2d 257, 265 (1st Cir. _____________ ______ 1976), cert. denied, 430 U.S. 909 (1977)), cert. denied, 112 S. ____ ______ ____ ______ Ct. 1507 (1992). We review Judge Mazzone's denial of the Towns' motion for his recusal under the abuse of discretion standard. United States v. L pez, 944 F.2d 33, 37 (1st Cir. 1991); Camacho _____________ _____ _______ v. Autoridad de Tel fonos de Puerto Rico, 868 F.2d 482, 490 (1st ______________________________________ Cir. 1989). Judge Mazzone made several statements in the course of -53- the Boston Harbor litigation which the Towns assert would cause a reasonable person to question his impartiality. The first statement was made on July 2, 1990, when Judge Mazzone denied a request by the United States for an order requiring the MWRA to commence the planning of an alternative landfill since the Massachusetts legislature had decided to postpone voting on the transfer of Walpole site from the Department of Corrections to the MWRA until December 5, 1990. Instead, Judge Mazzone chose to wait until after the December 5, 1990, vote in the Massachusetts legislature. The judge, however, made the following comment: At the same time, I am mindful of the high risk that attends my decision to forego action until December 5, 1990. At stake is the credibility of the Court's schedule and the public's faith in the integrity of the entire project. In the event that necessary legislation has not been approved by that date and that slippage in the schedule results from the paralysis surrounding the siting issue, I will entertain and intend to grant a motion for sanctions designed to ensure immediate resolution of the matter. It is true that Judge Mazzone's comments, viewed in isolation, might require further scrutiny. However, given the context in which these comments were made, we conclude that they at most indicate that Judge Mazzone was irritated at the snail's pace in which the Commonwealth was moving to fully comply with the district court's plan to clean up Boston Harbor. In fact, Judge Mazzone made the statement as a background comment to his denial ______ of a request by the United States for stricter compliance with -54- the court's mandated schedule. In this sense Judge Mazzone's comments -- to the effect that the Commonwealth was placed in actual notice that he would not tolerate further unjustified delays -- were eminently reasonable. Furthermore, the historical context on which these comments were made is significant. For more than five years, Judge Mazzone has overseen and continues to oversee the project to induce the Commonwealth and its agencies to comply with federal law by cleaning up Boston Harbor. Back in 1985, Judge Mazzone found the Commonwealth and the MWRA liable for violations of a permit issued under the provisions of the National Pollution Discharge Elimination System.36 These violations continue today. The second statement which the Towns claim amounts to specific behavior which reasonably calls into question Judge Mazzone impartiality is found in an Order entered after the Massachusetts legislature voted against the transfer of Walpole from the Department to the MWRA. The legislature voted against the transfer on December 6, 1990, and shortly thereafter, the United States filed a motion before Judge Mazzone to compel the transfer of the Walpole site to the MWRA or for sanctions. On February 25, 1991, Judge Mazzone granted the United States' motion by imposing a moratorium on any new sewer connections to MWRA's system. In response to an argument by the ____________________ 36 See generally United States v. Metropolitan Dist. Comm'n, 23 ___ _________ _____________ _________________________ Env't Rep. Cas. 1350 (D. Mass. 1985). -55- Commonwealth to the effect that any action by the district court would be premature, Judge Mazzone stated: First the statement that the schedule is not yet in severe jeopardy is true only if one assumes that the landfill will ultimately be located at the Walpole site. If I must eventually order the Commonwealth to effect the transfer, I can delay doing so for some time, although I do not believe that court action can wait as long as September, 1992. But if the Walpole site, for which much of the requisite studying, planning, and testing has already been completed, is not to be the ultimate site for the ___ landfill, then another site must be selected immediately if there is to be ___________ any chance of beginning construction as planned. In fact, given the need to complete state and federal environmental impact reports for any new site, it may already be too late. It is therefore my conclusion that there is now a real and imminent threat to the schedule. While that statement indicates that Judge Mazzone wanted a landfill site to be selected right away, and his concern that only the Walpole site was sufficiently advanced to meet the court's schedule, it does not indicate a preference for Walpole per se so long as some other suitable site was expeditiously ___ __ chosen. These statements simply show that Judge Mazzone was weighing the factors to take into account in determining an appropriate sanction to bring the Commonwealth into compliance with the scheduling order. Indeed, the statement reveals Judge Mazzone's awareness of the distinct possibility that at the end of the site selection process, Walpole might not be the site for the landfill. The Towns also claim that Judge Mazzone prejudged the -56- issues in this case because he stated that the Walpole site "was exhaustively reviewed and approved by the EPA, the MWRA and the Army Corps of Engineers . . .," a month after the complaint in this case was filed and before the defendants had answered it. Additionally, in one of the regularly issued compliance orders, dated March 1, 1991, Judge Mazzone stated: I have reviewed the record of decision attached to the permit, and note the Corps finding that the siting process for the Walpole-MCI [landfill] was satisfactory under both NEPA and 404(b)(1) guidelines. We find nothing here which rises to the level of partiality needed to compel recusal. If one considers that the MWRA spent more than $10 million in the site selection process, that the EPA closely monitored the MWRA site selection process and that the Corps issued a extensive Record of Decision supported by the administrative record, it seems more than reasonable to conclude that the site selection process was "exhaustively reviewed." And no reasonable person could conclude that merely noting that the Corps had reached a determination under the 404 Guidelines shows that Judge Mazzone was biased. In short, the statements of Judge Mazzone which the Towns claim would cause a reasonable person to question the impartiality of Judge Mazzone are statements which in our opinion state the obvious, and reflect common sense. Given the context in which these remarks were made and their substance, we hold that Towns have failed to show that Judge Mazzone committed an abuse of discretion in denying their motion for his disqualification. -57- Finally, the Towns claim that since Judge Mazzone has overseen compliance with the administration of the scheduling plan to clean up Boston Harbor, his sitting over the adversarial aspects of the case, including this Section 404 case, gives rise to an appearance of partiality requiring disqualification. Since Judge Mazzone has required strict compliance with the compliance plan -- including ordering a sewer moratorium to compel the Legislature to transfer the Walpole site -- and the Towns' challenge to the Section 404 permitting process represents a threat to the schedule, they contend a reasonable person would question the ability of Judge Mazzone to preside over the Section 404 case. There is a difference, however, between the real appearance of bias, and the fact that a judge is sometimes required to act against the backdrop of official positions he took in other related cases. A judge cannot be replaced every time a case presents an issue with which the judge's prior official decisions and positions may have a connection. This Circuit has made clear that "[o]ur system of justices does not require that judges be empty vessels, wholly ignorant of all of the antecedents of a case." Camacho, 868 F.2d at 490. The Towns _______ have made no showing that Judge Mazzone's actions in the Boston Harbor cleanup litigation personally placed him in a position in which he would have been constrained to decide the Section 404 case in favor of the Corps. There were other options compatible with continuing the Boston Harbor cleanup if the Walpole site proved unsatisfactory. We are unwilling to assume that a -58- district judge -- of whom there is no question whatever of any personal or improper interest -- would be so overcome by concerns in the Boston Harbor cleanup case as to unable to render a just and professional decision in this one. Judge Mazzone carefully considered the merits of the Towns' challenge to the Section 404 permitting process. He rejected the Corps' position that groundwater effects did not have to be considered under 40 C.F.R. 230.10(c). The fact that Judge Mazzone presided over other cases arising from the effort to clean up Boston Harbor makes him arguably the most qualified judge to preside over this case since his expertise in the legal aspects of the Boston Harbor cleanup, will result in a more just and efficient resolution of the issues in cases relating to the Boston Harbor cleanup effort. See, e.g., In Re Allied-Signal ___ ____ ____________________ Inc., 891 F.2d 967, 972 (1st Cir. 1989); cert. denied, 495 U.S. ____ ____ ______ 957 (1990). While it is obvious that a judge's prior orders might place him or her in a position that would lead a reasonable person to question whether he or she would remain impartial in a subsequent proceeding, see, e.g., United States v. Chantal, 902 ___ ____ _____________ _______ F.2d 1018 (1st Cir. 1990) (sentencing judge's views that defendant was an "unreconstructed drug trafficker" might lead a reasonable person to question the judge's impartiality in a subsequent sentencing proceeding), we do not find this to be such a case. L pez, 944 F.2d at 37 (minimal factual basis required _____ for an inference of impartiality) (citing United States v. ______________ Giorgi, 840 F.2d 1022, 1036 (1st Cir. 1988). We add that had ______ -59- another judge been assigned to this case, he or she would plainly not have viewed Walpole's case in a vacuum. That judge would have learned of the Boston Harbor cleanup schedule and would have been exposed to whatever additional concerns compliance with that schedule imposed here. This last point requires us to further comment. Although parties are not to be discouraged or castigated in the pursuit of good faith challenges to the impartiality of a particular judge or judges, neither should such action be taken lightly or without foundation, merely as another tactical weapon in the arsenal of trial strategy. While we understand appellant's feelings, we hold that the disqualification motion in this case was totally without a basis in fact or law. VI In conclusion, we find that the Corps properly applied its Section 404(b)(1) Guidelines and properly concluded that the landfill was not contrary to the public interest. The district court did not abuse its discretion in allowing the defendants' motion to quash the subpoena and protective order and denying the Towns' motion for the judge's disqualification. Affirmed. ________ -60-